# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LAREDO RIDGE WIND, LLC; BROKEN BOW WIND, LLC, and CROFTON BLUFFS WIND, LLC<br><br>　　　　Plaintiffs,<br><br>v.<br><br>NEBRASKA PUBLIC POWER DISTRICT,<br><br>　　　　Defendant. | Case No. 8:19-cv-45<br><br>**COMPLAINT** |

Plaintiffs, Laredo Ridge Wind, LLC ("Laredo"), Broken Bow Wind, LLC ("Broken Bow"), and Crofton Bluffs Wind, LLC ("Crofton") (collectively the "Projects" or "Project Entities"), for their cause of action against the Defendant, Nebraska Public Power District ("NPPD"), state and allege as follows:

## INTRODUCTION

1.　This is an action for declaratory and injunctive relief regarding NPPD's stated intention to improperly terminate Power Purchase Agreements ("PPAs") currently in force between NPPD and each of the Project Entities on or after February 11, 2019. Termination of the PPAs would effectively destroy each Plaintiff's wind energy project as a going concern, and immediate injunctive relief precluding termination and retaining the status quo is therefore necessary to prevent irreparable harm to the Plaintiffs.

## PARTIES AND JURISDICTION

2.　Laredo is a limited liability company organized under Delaware law. Laredo's sole member is Mission Wind Laredo, LLC. There are numerous additional

parent tiers of membership above Laredo, the nearest of which to Laredo that are not also limited liability companies are Clearway Energy, Inc., a Delaware corporation with its principal place of business in Princeton, New Jersey, and GIP III Zephyr Acquisition Partners, LLP ("GIP"), a limited liability partnership in which none of the general or limited partners are residents or citizens of the State of Nebraska.  None of the non-LLC or partnership ownership interests upstream from Laredo are residents or citizens of the State of Nebraska.  Accordingly, for purposes of diversity jurisdiction, Laredo is not a citizen of the State of Nebraska.

       3.      Laredo owns and operates a wind energy generation facility located in Boone County, Nebraska.  The facility is comprised of 54 wind turbines and related equipment and improvements, with a capacity of approximately 80 megawatts.

       4.      Broken Bow is a limited liability company organized under Delaware law.  Broken Bow's sole member is Mission Wind Broken Bow, LLC.  There are numerous additional parent tiers of ownership above Broken Bow, the nearest of which to Broken Bow that is not also a limited liability company is Capistrano Wind Holdings, Inc., a Delaware Corporation with its principal place of business in San Francisco, California.  None of the non-LLC or partnership ownership interests upstream from Broken Bow are residents or citizens of the State of Nebraska.  Accordingly, for purposes of diversity jurisdiction, Broken Bow is not a citizen of the State of Nebraska.

       5.      Broken Bow owns and operates a wind energy generation facility located in Custer County, Nebraska.  The facility is comprised of 50 wind turbines and related equipment and improvements, with a capacity of approximately 80 megawatts.

6. Crofton is a limited liability company organized under Delaware law. Crofton's sole member is Mission Wind Crofton Bluffs, LLC. There are numerous additional parent tiers of membership above Crofton, the nearest of which to Crofton that is not also a limited liability company is Capistrano Wind Holdings, Inc., a Delaware Corporation with its principal place of business in San Francisco, California. None of the non-LLC or partnership ownership interests upstream from Crofton are residents or citizens of the State of Nebraska. Accordingly, for purposes of diversity jurisdiction, Crofton is not a citizen of the State of Nebraska.

7. Crofton owns and operates a wind energy generation facility located in Knox County, Nebraska. The facility is comprised of 20 wind turbines and related equipment and improvements, with a capacity of approximately 42 megawatts.

8. NPPD is a Nebraska political subdivision and public power district, and is Nebraska's largest electric utility. NPPD is a citizen of the State of Nebraska for purposes of diversity jurisdiction.

9. This Court has original jurisdiction over the issues presented in the Complaint pursuant to 28 U.S.C. § 1332. The parties are citizens of different states, and are not citizens of the same state. The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000, as 2019 fiscal year projected annual revenue to be paid by NPPD to the Plaintiffs under the three PPAs at issue exceeds $38.5 million. Plaintiffs seek declaratory relief pursuant to 28 U.S.C. § 2201.

10. Venue in this District is proper under 28 U.S.C. § 1391(b)(1). NPPD is the sole defendant and is a resident of the judicial district in which this action is brought.

**BACKGROUND**

11.  The three wind energy Projects were originally developed between 2008 and 2012 by affiliates of Edison Mission Energy ("EME").  Each Project was developed utilizing a complex, multi-tier affiliate ownership structure, with the individual project operating entity standing alone at the bottom tier.  The ownership structure was largely a function of the syndication of multiple wind energy projects necessary for financing purposes, and to take advantage of available federal tax credits and other incentives.

12.  At or near the time the Projects were originally developed, each of the three Project Entities entered into a Power Purchase Agreement ("PPA") with NPPD, each containing identical terms and conditions relevant to the issues raised in this action.  The PPAs provided for NPPD's purchase of all energy produced by each project for a period of 20 years, at guaranteed pre-determined pricing that gradually increased each year.  The execution of a long-term PPA is a critical aspect of wind energy project development, necessary to obtain financing and other required prerequisites for construction and operation of the facility to take place.

13.  With a PPA in place, each Project successfully reached commercial operation.  NPPD has been purchasing all the power produced by each Project continuously since commercial operation began, a period of at least six years in each instance.

14.  EME filed for bankruptcy protection in 2012. In April of 2014, affiliates of NRG Energy, Inc. ("NRG") acquired from EME equity interests in distant parent companies of the three Project Entities, together with those of many other EME subsidiary project companies, in a transaction approved by the bankruptcy court (the

"NRG Acquisition"). Notwithstanding the NRG Acquisition, the direct membership interests of the three Project Entities that are the Plaintiffs in this case and the named parties to the PPAs, were not sold, transferred, or otherwise changed. Further, with respect to Crofton and Broken Bow, NRG acquired only twenty-two percent of non-voting parent equity, far less than a majority share.

15. NPPD had actual knowledge of the NRG Acquisition at or near the time it closed in 2014. NPPD has since had actual knowledge of, and executed documents in connection with, NRG refinancing transactions that took place after the NRG Acquisition. Notwithstanding that knowledge, NPPD made no concurrent objection to the NRG Acquisition or to the refinancing transactions, and NPPD continued to perform its obligations under the PPAs.

16. In August of 2018, GIP acquired equity interests in distant parent companies of the Project Entities from NRG, together with those of many other NRG renewable energy projects (the "GIP Acquisition"). Notwithstanding the GIP Acquisition, the direct membership interests of the three Project Entities that are the Plaintiffs in this case and the named parties to the PPAs, were not sold, transferred, or otherwise changed. Further, with respect to Crofton and Broken Bow, GIP acquired only twenty-two percent of non-voting parent equity, far less than a majority share.

17. NPPD had actual knowledge of the GIP Acquisition through an announcement made to NRG customers on February 8, 2018, shortly after execution of the purchase agreement. Notwithstanding that knowledge, NPPD made no concurrent objection to the GIP Acquisition, and NPPD continued to perform its obligations under the PPAs.

18. Neither the NRG Acquisition nor the GIP Acquisition had any material adverse impact upon risk to NPPD of the Project Entities failing to perform their obligations under the PPAs, or any negative impact upon the financial position of NPPD in connection with the Projects.  Nothing changed at the Project level – the wind energy assets, the people and functions supporting those assets, and all financial activity affecting NPPD remained in place.  NPPD likewise faced no greater risks resulting from the financial position of the acquiring parties than it did before each acquisition or when the PPAs were executed.

19. The current price paid by NPPD per megawatt hour under the Project PPAs is more than double the current market price.

20. On January 11, 2019, NPPD provided written notice to each Project Entity of an alleged event of default under the PPAs, stating that both the 2014 NRG Acquisition and the 2018 GIP Acquisition were in violation of section 10.2 of the PPAs.  Section 10.2, in relevant part and with only slight immaterial variation from contract to contract, provides in each PPA as follows:

**10.2  Permitted Transactions**

10.2.1   Seller [defined in the PPAs opening paragraph to be the Project Entity] shall not:  (a) consolidate or merge with any other Person, or reorganize, consolidate, Change Control or change the form of Seller's business organization from a limited liability company; or, (b) sell, transfer, lease, transfer by operation of Law, or otherwise dispose of the Site or Plant or any unit thereof except as permitted by Section 11.2.2, or all or substantially all of Seller's assets; or (c) assign this Agreement, or any of its rights or obligations under this Agreement (each, a "Transaction") to any Person (the "Transferee"), whether in a single transaction or series of transactions, unless such Transaction is expressly approved in writing by NPPD, except NPPD approval shall not be required for Transactions permitted by Section 10.4 (and the related Schedule 3) or 20.11, and any Transaction in the absence of such required approval shall be void and of no legal effect.  Any

6

>       Transaction or conveyance, transfer or assignment to a Seller Lender under section 20.11 shall not release or discharge Seller of its obligations under this Agreement without the express grant of a written release and discharge by NPPD.

* * *

> 10.2.3   "Change Control" means the sale or transfer after the Effective Date of _a majority of the direct ownership interests in Seller_ but excludes transfers to Affiliates of Edison Mission Energy, the enforcement of liens on such ownership interests (and sales or transfers by Seller Lenders) permitted by Section 20.11, transfers to establish or maintain qualification as a C-BED Project, transfers of ownership interests among the owners of Seller and transfers due to the death of individual owners. Affiliates of Edison Mission Energy shall mean any other Person that controls, is under the control of, or is under common control with, Edison Mission Energy. The term "control" (including the terms "controls", "under the control of" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management of the policies of a Person, whether through ownership interest, by contract or otherwise.

(emphasis added). NPPD demanded that each Project Entity cure the alleged default and stated that "NPPD intends to provide written notice…of termination" if the alleged default is not cured within 30 calendar days. NPPD's alleged right to terminate the PPAs, if valid, would commence on February 11, 2019.

      21.    There has been no violation or breach of section 10.2 of the PPAs by Plaintiffs. The NRG Acquisition and the GIP Acquisition are not prohibited by section 10.2, as there has been no sale or transfer of a majority of the direct ownership interests of any Project Entity, nor has any Project Entity been consolidated, merged, reorganized or changed in form, nor has there been a transaction involving Project assets or an assignment of the PPAs or other contracts. Moreover, even if there were a breach of section 10.2, which Plaintiffs deny, the breach is not material because there has been no adverse impact upon NPPD, nor any change in the risk of non-

performance of the contract by the Project Entities. In addition, even if there were a material breach, which Plaintiffs deny, NPPD has waived or is estopped from asserting it against Plaintiffs. NPPD has therefore not been excused by an event of default from its obligation to perform under the PPAs, and NPPD has no legal right to terminate the PPAs.

22. Termination of the PPAs by NPPD would constitute an event of default under the credit agreements through which financing has been provided to each Project, triggering lender remedies to take possession of Project cash and facilities, accelerate debt, and foreclose security interests in Project assets, among other lender rights. Exercise of those lender remedies would result in the loss of each Project as a going concern and likely bankruptcy.

23. NPPD, as a political subdivision, has the statutory power to exercise eminent domain. NPPD waived that right as to these Projects for the full 20 year term of the PPAs, in section 10.1 of the PPAs. However, section 10.1 also provides that NPPD's waiver of its eminent domain right terminates if the PPA is terminated due to an event of default. Accordingly, were NPPD to terminate the PPAs, NPPD would immediately acquire the right to pursue condemnation of the Projects through the exercise of eminent domain at post-termination fair market value.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

24. Plaintiffs incorporate their prior allegations as if set forth here.

25. There exists a current, ripe and active dispute between the parties regarding whether the NRG Acquisition or the GIP Acquisition violate section 10.2 of

the PPAs, whether an event of default has occurred under the PPAs, and whether NPPD has a legal right to terminate the PPAs.

26. Plaintiffs are parties to the PPAs, whose rights are directly affected by NPPD's notice of default and intended termination, and each requires a declaration of its rights, status and legal relations under the PPAs.

27. A declaration of Plaintiffs' legal rights under the PPAs would terminate the uncertainty and controversy caused by NPPD's notices of default.

28. Plaintiffs therefore require, and hereby request in accordance with 28 U.S.C. § 2201, that the Court issue an order declaring that the NRG Acquisition and the GIP Acquisition do not violate section 10.2 of the PPAs, that an event of default has not occurred under the PPAs, and that NPPD has no legal right to terminate the PPAs. In the alternative, Plaintiffs seek an order declaring that NPPD has waived its right to terminate the PPAs under Section 10.2.

29. Plaintiffs will suffer irreparable harm if the PPAs are terminated by NPPD before the Court renders a final declaration of Plaintiffs' rights and legal relations under the PPAs. If NPPD terminates the PPAs, the Projects will be in default under credit agreements with their respective lenders, creating a material risk of potential bankruptcy to avoid the immediate adverse impact of creditor remedies. Moreover, termination of the PPAs would effectively eliminate the value of each Project as a viable going concern, as NPPD would no longer be obligated to purchase the entire output of the Projects at contract prices for the remaining term of the PPAs, upon which each Project's business plan has been premised. Further, termination would immediately vest in NPPD a statutory right to acquire the Projects by eminent domain, at a then-

existing, post-termination fair market value that would be materially reduced by NPPD's wrongful termination of the PPAs. Finally, in section 10.3 of the PPAs, NPPD agreed that a "failure or threatened failure to comply with the terms of this Section 10 may cause irreparable injury" and that each party "shall have the right to obtain from any competent court a decree enjoining such breach or threatened breach of this Section 10." Monetary damages cannot fairly compensate Plaintiffs for such harm, and immediate injunctive relief is required and appropriate.

WHEREFORE, Plaintiffs respectfully request that the Court declare and determine that the NRG Acquisition and the GIP Acquisition do not violate section 10.2 of the PPAs, that an event of default has not occurred under the PPAs, and that NPPD has no legal right to terminate the PPAs; that the Court enter a temporary restraining order and preliminary injunction maintaining the status quo and precluding NPPD from terminating the PPAs pending the final disposition of this action; that the Court enter a permanent injunction precluding NPPD from terminating the PPAs in reliance upon these alleged events of default; for the costs of this action; and, for such further relief as the Court finds just, equitable and appropriate.

**PLAINTIFFS REQUESTS TRIAL IN OMAHA, NEBRASKA.**

Dated this 30th day of January, 2019.

                LAREDO RIDGE WIND, LLC; BROKEN BOW WIND, LLC, and CROFTON BLUFFS WIND, LLC, Plaintiffs

By: /s/Steven D. Davidson
     Steven D. Davidson (#78775)
     Kenneth W. Hartman (#21954)
     Spencer R. Murphy (#26081)
of:  BAIRD HOLM LLP
     1500 Woodmen Tower
     1700 Farnam Street
     Omaha, Nebraska 68102
     Email: sdavidson@bairdholm.com
            khartman@bairdholm.com
            smurphy@bairdholm.com
     Telephone: (402) 344-0500

DOCS/2218699.1