IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LAREDO RIDGE WIND, LLC;<br>BROKEN BOW WIND, LLC; and<br>CROFTON BLUFFS WIND, LLC, | ) ) ) ) | CASE NO: 8:19-CV-45 |
| Plaintiffs, | ) ) | |
| v. | ) | **FIRST AMENDED** |
| NEBRASKA PUBLIC POWER<br>DISTRICT, | ) ) ) | **THIRD-PARTY COMPLAINT FOR<br>DECLARATORY JUDGMENT AND<br>DEMAND FOR JURY TRIAL IN** |
| Defendant / Third-Party Plaintiff, | ) ) | **OMAHA, NEBRASKA** |
| v. | ) ) | |
| ELKHORN RIDGE WIND, L.L.C., a<br>Delaware Limited Liability Company | ) ) ) | |
| Third-Party Defendant. | ) | |

Pursuant to Federal Rule of Civil Procedure 14(a)(1), Defendant/Third-Party Plaintiff

Nebraska Public Power District ("NPPD") files its First Amended Third-Party Complaint against

Third-Party Defendant, Elkhorn Ridge Wind, L.L.C. ("Elkhorn Ridge"), and states and alleges as

follows:

**INTRODUCTION**

NPPD seeks a Declaratory Judgment pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P.

57.  Pursuant to 28 U.S.C. § 2201, this Court "may declare the rights and other legal relations of

any interested party seeking such declaration, whether or not further relief is or could be sought."

NPPD also seeks damages for Counter-Defendant's breach of the parties' Power Purchase

Agreements.

## PARTIES

1.      Third-Party Plaintiff, NPPD, is a Political Subdivision of the State of Nebraska.

2.      Third-Party Defendant, Elkhorn Ridge, is, upon information and belief, a Delaware limited liability company with one or more members that are Nebraska residents.

## JURISDICTION AND VENUE

3.      This Court has federal diversity jurisdiction pursuant to 28 U.S.C. § 1332 over the Complaint filed by Laredo Ridge Wind, L.L.C. ("Laredo Ridge"), Broken Bow Wind, L.L.C. ("Broken Bow") and Crofton Bluffs Wind, L.L.C. ("Crofton Bluffs"), as well as the Counterclaims filed by Defendant NPPD because there is complete diversity and the amount of those claims each exceed $75,000.00.

4.      This Court can exercise supplemental jurisdiction over the Third-Party Complaint pursuant to 28 U.S.C. § 1367 as the Complaint, NPPD's Counterclaims, and NPPD's Third-Party Complaint share and derive from a common nucleus of operative facts.  In addition, there are common issues of law as to the Complaint, Counterclaims and the Third-Party Complaint.

5.      Under 28 U.S.C. § 1367(b), exercising supplemental jurisdiction does not destroy this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332 over the Complaint filed by Laredo Ridge, Broken Bow, and Crofton Bluffs because NPPD brings this third-party claim as a Third-Party Plaintiff.

6.      Venue is proper in the District of Nebraska.  NPPD and Elkhorn Ridge entered into a written contract to be performed in the State of Nebraska.

## BACKGROUND

7.      Between 2008 and 2011, NPPD entered into a Power Purchase Agreement ("PPA") with each Plaintiff/Counterclaim Defendant and Third-Party Defendant Elkhorn Ridge.

The materially relevant terms and provisions discussed herein concerning the Elkhorn Ridge PPA are identical to the terms of the PPAs entered by Laredo Ridge, Broken Bow, and Crofton Bluffs.  For purposes of this Third-Party Complaint, all words capitalized herein (except for proper nouns) are specifically defined by the Elkhorn Ridge PPA.

8.      NPPD's PPA with Elkhorn Ridge was executed on or about February 27, 2008. The PPA has a twenty (20) year Term.  (Elkhorn Ridge PPA, § 3.1 ("Term")).

### General Terms of Elkhorn Ridge PPA

9.      Under the Elkhorn Ridge PPA, Elkhorn Ridge is contractually obligated to sell to NPPD all power its plant generates during the PPA's Term.  (Elkhorn Ridge PPA, § 5.2.1).

10.     Conversely, NPPD is contractually obligated to purchase from Elkhorn Ridge all power its plant generates during the PPA's Terms.  (Elkhorn Ridge PPA, § 5.2.1.)

11.     The Elkhorn Ridge PPA is governed by a "Governing Law" provision, which provides for the PPA to be governed by the laws of the State of Nebraska.  (Elkhorn Ridge PPA, § 20.6.)

12.     The "Jurisdiction" term of the Elkhorn Ridge PPA requires that any legal proceedings in connection with or related to the PPA shall be brought in a state or federal court of competent jurisdiction within the State of Nebraska.  (Elkhorn Ridge PPA, § 20.7).  Elkhorn Ridge further agreed to consent and submit to the personal jurisdiction of any such court located in Nebraska.  (Elkhorn Ridge PPA, § 20.7.2)

### Elkhorn Ridge's Ownership and Control

13.     At the time NPPD and Elkhorn Ridge entered into the PPA, Edison Mission Energy or its affiliates owned equity interests in Elkhorn Ridge.

14.     Pursuant to the "Permitted Transactions" term of the PPA, Elkhorn Ridge PPA may not:

>    a.   Consolidate or merge with any other Person, or reorganize, consolidate, Change Control or change the form of Elkhorn Ridge's business organization from a limited liability company; or
>
>    b.   Sell, transfer, lease, transfer by operation of Law, or otherwise dispose of the Site or Plant; or
>
>    c.   Assign the PPA, or any of its rights or obligations under the PPA to any Person, whether in a single transaction or series of transactions.

(Elkhorn Ridge PPA, Section 10.2.1).

15.     Under the PPA, a "Transaction" (as that term is defined by the PPA) is prohibited unless the Transaction is expressly approved in writing by NPPD.  If written approval is not obtained, the Transaction shall be void and of no legal effect.  (Elkhorn Ridge PPA, Section 10.2.1 ("Permitted Transactions")).

16.     The PPAs state that Change Control is to sell or transfer a majority of the direct ownership in Counter-Defendants but excludes transfers to Affiliates of Edison Mission Energy. Affiliates of Edison Mission Energy means any Person that controls, is under the control of, or is under common control with, Edison Mission Energy. The PPAs state Control is the possession, directly or indirectly, of the power to direct or cause the direction of the management of the policies of a Person, whether through ownership interest, by contract or otherwise. (Laredo Ridge PPA, Section 10.2.3 ("Permitted Transactions"); Broken Bow PPA, Section 10.2.3 ("Permitted Transactions"); Crofton Bluffs PPA, Section 10.2.3 ("Permitted Transactions")).

### *Edison Mission Energy Bankruptcy and 2014 Sale to NRG*

17.     In 2012, Edison Mission Energy and nineteen of its subsidiaries (collectively, the "Bankruptcy Debtors") filed for Chapter 11 Bankruptcy in the United States Bankruptcy Court of the Northern District of Illinois (Eastern Division).  Those cases were jointly administered under Case No. 12-49219 (JPC).  No trustee was appointed.

18.     On October 18, 2013, the Bankruptcy Debtors filed a motion ("Motion") requesting that the bankruptcy court approve a sale transaction ("2014 Sale") which the Bankruptcy Debtors had tentatively reached with NRG Energy, Inc., and NRG Energy Holdings, Inc. (collectively, "NRG").  The proposed sale called for NRG's acquisition of 262 Edison Mission Energy related entities, including each Plaintiff and Third-Party Defendant Elkhorn Ridge in this case (referred to as "Acquired Companies").

19.     According to the Motion, the proposed 2014 Sale resulted from "hard-fought," "arms-length negotiations" between Edison Mission Energy, its stakeholders and NRG.

20.     The terms of the 2014 Sale called for NRG to "acquire," and for Edison Mission Energy to "sell," all of Edison Mission Energy's "interests in other Acquired Companies and the Acquired Companies' interests in their respective assets," subject to certain exclusions.  In addition, NRG acquired all executory contracts (and other assets).

21.     In exchange for the Acquired Companies, NRG agreed to pay Edison Mission Energy $2.285 Billion in cash and $350 Million in common stock of NRG Energy Holdings, Inc.

22.     Edison Mission Energy and NRG stated and represented to the bankruptcy court that "none of the Parties will act or represent or hold itself out as having authority to act as an agent or partner of the other Parties. . . [and that nothing] in this Agreement will be construed as

creating a partnership, joint venture, agency, trust, fiduciary relationship or other association of any kind. . ."

23.     In addition, NRG represented that other than the 2014 Sale and related documents, and arrangements with two investment banks,

> there are no Contracts, undertakings, commitments, agreements or obligations, whether written or oral, between a Purchaser Party or any of its Affiliates or any of its or their Related Persons, on the one hand, and any member of the management of [Edison Mission Energy] of any of the Acquired Companies or the board or directors of [Edison Mission Energy], any holder of equity or debt securities of [Edison Mission Energy] or the Acquired Companies, or any lender or creditor of [Edison Mission Energy] or the Acquired Companies, on the other hand, (a) relating in any way to the acquisition of the Target Holdings or the transactions contemplated by this Agreement or (b) that would be reasonably likely to prevent, restrict, impede or affect adversely the ability of [Edison Mission Energy] to entertain, negotiate or participate in any Acquisition Proposal.

(Proposed Plan, Section 6.4).

24.     The bankruptcy plan Edison Mission Energy proposed to the court, and the court approved, required that Edison Mission Energy put counterparties to certain contracts (referred to as "Available Contracts") on notice of the potential assumption or assignment of the PPA.  Pursuant to Section 4.5 of the proposed Asset Purchase Agreement:

> (b) Contemporaneously with the delivery of the Available Contract List to Purchaser, EME shall provide notice (the "Available Contracts Notice") to all counterparties to the Available Contracts of (i) the Proposed Cure Amounts (if any), (ii) the identity of the party to which Available Contracts may be assumed and/or assigned, as applicable, (which shall be Purchaser in the case of Available Contracts to which EME is a party and the Acquired Company party thereto in the case of the other Available Contracts), (iii) the procedures for filing objections to the Proposed Cure Amounts, and (iv) the process by which related disputes will be resolved by the Bankruptcy Court. The Available Contracts Notice shall serve as notice of the potential assumption and/or assignment of the Available Contracts listed therein, along with the potential assignment of such Available Contracts to the assignees listed therein (where applicable), and the Proposed Cure Amounts.  The deadline for non-Debtor counterparties to all Available Contracts to object to the Proposed Cure Amounts shall be on or before the

date that is ten (10) Business Days prior to the Plan Confirmation Hearing (the "Cure Amount Objection Deadline").

Edison Mission Energy did not give NPPD the notice required under Section 4.5(b). NPPD was not informed of the sale, and did not independently learn of the sale, until long after it was completed.

25.     On March 11, 2014, the bankruptcy court entered an order approving the proposed plan, which included the 2014 Sale. The list of Acquired Companies approved by the court included Elkhorn Ridge.

26.     The 2014 Sale the bankruptcy court approved "was completed on April 1, 2014, with the sale of substantially all of [Edison Mission Energy's] assets to NRG Energy, Inc. and the transactions called for in the" Chapter 11 plan. (Edison International 10-Q filed 4/29/2014).

27.     The Reorganized Edison Mission Energy would have new governing documents and a new board of directors.

28.     Under the Elkhorn Ridge PPA, Elkhorn Ridge could not engage in a prohibited Transaction unless NPPD expressly approved the Transaction in writing. (Elkhorn Ridge PPA, § 10.2.1)

29.     On or about December 3, 2014, some eight months *after* the 2014 Sale was completed, an NRG manager emailed NPPD requesting that NPPD execute a "Consent to a Change of Control and Amendment for Power Purchase Agreement" for Laredo Ridge [Plaintiff]. In the email, NRG explained that it was "in the process of completing a transaction that would change control of Seller at Laredo Ridge. . . As a result, we need NPPD's consent to finalize the transaction and amend the PPA."

30.     NPPD never received any notification from Edison Mission Energy or NRG pertaining to the sale of Elkhorn Ridge.

31.     A few weeks later, on December 18, 2014, an attorney for NRG sent a second email to NPPD.  This time, however, NRG declared that "upon further review of the PPA," NPPD's consent was not required "[s]ince the proposed transfer is an indirect transfer of ownership interests in Seller." NRG further informed NPPD that NPPD need not execute the consent form emailed on December 3, 2014.

32.     When NPPD attempted to follow up via an email in January 2015, NRG acknowledged receipt of the email and indicated it would "review and respond."  NRG never responded.

33.     NPPD never gave its written consent to the 2014 Sale and never executed any consent form.

34.     The Elkhorn Ridge PPA was never amended after the 2014 Sale.

35.     The 2014 Sale was a prohibited Transaction under the Elkhorn Ridge PPA because NRG was not an "Affiliate" of Edison Mission Energy as that term is defined by the PPA.  Following the bankruptcy, Edison Mission Energy remained a wholly owned subsidiary of Edison International.  Thus, NRG did not control Edison Mission Energy; Edison Mission Energy did not control NRG; and Edison Mission Energy was not under common control with NRG.

36.     Besides NRG not being an Affiliate of Edison Mission Energy, the Control of Elkhorn Ridge changed.  Edison Mission Energy no longer possesses the power to direct or cause the direction of the management of Elkhorn Ridge's policies, whether through ownership interest, by contract or otherwise.  (Elkhorn Ridge PPA, § 10.2.3 ("Permitted Transactions")).

37.     To the contrary, as part of the terms of the 2014 Sale, as of the date of the Closing of the Sale Transaction, Edison Mission Energy "shall not, and shall not cause its Subsidiaries to

not" . . . "materially change the accounting, billing, cash management, inventory, and spare parts practices used by [Edison Mission Energy] and its Subsidiaries from present practices. (Doc. 1375-2, p. 68 of 180) Edison Mission Energy and its Subsidiaries also could not (except under certain limited circumstances) increase the compensation of the directors, officers or employees of Edison Mission Energy or its Subsidiaries; enter into, adopt, amend[,] modify or terminate various compensation or benefit plans; or enter into or amend any Collective Bargaining Agreement (except under certain limited circumstances).

38.     At some point in time, Elkhorn Ridge became an entity of NRG Yield, Inc. NRG Yield was owned by NRG Energy, Inc., one of the Purchasing Parties in the bankruptcy.

### *Operation and Management of Elkhorn Ridge Changed with the Sale*

39.     Under its PPA with NPPD, Elkhorn Ridge represented to NPPD that "Subject to NPPD's rights under this Agreement, [Elkhorn Ridge] intends to construct, solely own, operate and maintain the Plant and Site in a manner which will at all times meet the requirements of this Agreement." (Elkhorn PPA, § 4.2). Thus, under the PPAs' plain terms, *Elkhorn Ridge* was to "operate and maintain" its plant and site.

40.     Instead, Elkhorn Ridge abdicated its contractual duties by turning over the operation, maintenance and control to others.

41.     On or about July 22, 2013, pursuant to a "Management Services Agreement" ("MSA"), NRG Yield, Inc. ("Yield"), NRG Yield LLC ("Yield LLC"), and NRG Yield Operating LLC ("Yield Operating") entered into an agreement with the parent company, NRG Energy, Inc. ("NRG"), whereby NRG would assume all responsibility for the management, operation and control of "Service Recipients." The MSA defined "Service Recipients" as Yield, Yield LLC, Yield Operating, all subsidiaries listed in a schedule, and any other Subsidiary of

Yield, Yield LLC and Yield Operating acquired or formed after the MSA contract date that

receives services from Manager.

42.     As a result of the 2014 Transaction, Elkhorn Ridge became a subsidiary of Yield,

Yield LLC, and Yield Operating and, upon information and belief, became a Service Recipient

under the MSA.

43.     The terms of the MSA grant broad powers to NRG, including but not limited to

the following:

      a.   "causing or supervising the carrying out of all day to day management,

          secretarial, accounting, banking, treasury, administrative, liaison,

          representative, regulatory and reporting functions and obligations;

      b.   establishing and maintaining or supervising the establishment and

          maintenance of books and records;

      c.   identifying, evaluating and recommending to the Yield Group acquisitions or

          dispositions from time to time and, where requested to do so, assisting in

          negotiating the terms of such acquisitions or dispositions;

      d.   recommending and, where requested to do so, assisting in the raising of funds

          whether by way of debt, equity or otherwise, including the preparation, review

          or distribution of any prospectus or offering memorandum in respect thereof

          and assisting with communications support in connection therewith;

      e.   recommending to the members of the Yield Group suitable candidates to serve

          on the Governing Bodies of the Yield Group;

      f.   making recommendations with respect to the exercise of any voting rights to

          which the Service Recipients are entitled in respect of its Subsidiaries;

g.   making recommendations with respect to the payment of dividends by the

Service Recipients or any other distributions by the Service Recipients,

including distributions by Yield to its stockholders;

h.   monitoring and/or oversight of the applicable Service Recipient's accountants,

legal counsel and other accounting, financial or legal advisors and technical,

commercial, marketing and other independent experts and managing litigation

in which a Service Recipient is sued or commencing litigation after consulting

with, and subject to the approval of, the relevant Governing Body;

i.   attending to all matters necessary for any reorganization, bankruptcy

proceedings, dissolution or winding up of a Service Recipient, subject to

approval by the relevant Governing Body;

j.   supervising the timely calculation and payment of taxes payable, and the filing

of all tax returns, by each Service Recipient;

k.   causing or supervising the preparation of the Service Recipients' annual

combined financial statements and quarterly interim financial statements (i) to

be prepared in accordance with GAAP and audited at least to such extent and

with such frequency as may be required by law, regulation or in order to

comply with any debt covenants; and (ii) to be submitted to the Governing

Body of each Service Recipient;

l.   making recommendations in relation to and effecting the entry into insurance

of each Service Recipient's assets, together with other insurances against

other risks, including directors and officers insurance, as the relevant Service

Provider and the relevant Governing Body may from time to time agree;

    m.  arranging for individuals to carry out the functions of the principal executive, accounting and financial officers for Yield only for purposes of applicable securities laws and the regulations of any stock exchange on which the Securities of Yield are listed and subject to the approval of Yield's Governing Body;

    n.  providing individuals to act as senior officers of the Service Recipients as agreed from time to time, subject to the approval of the relevant Governing Body;

    o.  advising the Service Recipients regarding the maintenance of compliance with applicable Laws and other obligations."

(MSA, § 3.1). The MSA further allowed NRG to subcontract any of these Services to its Affiliates or to any other third party as NRG determined. (MSA, §§ 2.3 and 1.1.34).

44.    To allow NRG to provide these Services, each Service Recipient was obligated to give NRG and its Affiliates (other than any member of the Yield Group) "full access to all documentation and information" needed to perform the Services.

45.    In exchange for providing Services to the Service Recipients, NRG received an Annual Fee Amount of $4 million.

46.    In addition to this base amount, NRG also received 0.05% of the Enterprise Value of any Acquired Assets.

47.    Service Recipients were also obligated to reimburse NRG for all its out-of-pocket expenses.

48.    Besides being paid millions for its Services, and incurring no out-of-pocket expenses, NRG was relieved of all liability to Service Recipients except for its "bad faith, fraud,

willful misconduct or gross negligence." Even then, NRG's liability was limited to the amounts the Service Recipient had paid for the Services in the two most recent calendar years.

49.     Though NRG ran the day-to-day operations and management of each Service Recipient, the MSA prohibited termination of the agreement "due solely to the poor performance or underperformance" of the Subsidiaries.

50.     As a result of the MSA, NRG nevertheless exercised complete control over the LLCs' day-to-day management and operations.

51.     Elkhorn Ridge's complete and total abdication of its management and operational responsibilities violated not only the PPA's express terms, but its spirit as well.

### NRG's 2018 Sale to Global Infrastructure Partners

52.     Elkhorn Ridge continued its operations as an NRG-owned and operated entity until August of 2018.

53.     On August 31, 2018, NRG Energy sold its "entire ownership interest" in NRG Yield, as well as NRG Energy's "renewable development and operations platform," to Global Infrastructures Partners ("GIP"), a venture capitalist group (hereinafter, the "2018 Sale").

54.     Elkhorn Ridge did not put NPPD on notice of the prohibited 2018 Sale Transaction, and NPPD did not give its written consent to the sale of Elkhorn Ridge from NRG to GIP.

55.     As part of the 2018 Sale, NRG Yield changed its name to Clearway Energy, Inc. In addition, the three NRG-appointed directors all resigned their positions and the size of the board increased to nine directors (comprised of five directors designated by GIP, three independent directors and the CEO of the Company).

56.     Following completion of the 2018 Sale, GIP became Clearway Energy's "controlling investor," and with it, obtained control of Clearway Energy's holdings, including Elkhorn Ridge.

57.     Under the Elkhorn Ridge PPA, Elkhorn Ridge could not engage in a prohibited Transaction unless NPPD expressly approved the Transaction in writing.  (Elkhorn Ridge PPA, § 10.2.1 ("Permitted Transactions")).

58.     In February 2018, NRG sent a letter to NPPD announcing that NRG and GIP had already entered into an agreement for GIP to purchase NRG's interest in NRG Yield, a publicly traded company.  However, at no time did NRG or GIP request that NPPD consent to the 2018 Sale.

59.     The 2018 Sale was a prohibited Transactions under the Elkhorn Ridge PPA because GIP was not an "Affiliate" of Edison Mission Energy as that term is defined by the Elkhorn Ridge PPA.  GIP did not control Edison Mission Energy; Edison Mission Energy did not control GIP; and Edison Mission Energy was not under common control with GIP.

60.     Besides GIP not being an Affiliate of Edison Mission Energy, the Control of Elkhorn Ridge changed.  Edison Mission Energy no longer possesses the power to direct or cause the direction of the management of Elkhorn Ridge's policies, whether through ownership interest, by contract or otherwise.  (Elkhorn Ridge PPA, § 10.2.3 ("Permitted Transactions")).  Edison Mission Energy lost all such power and authority upon consummation of the bankruptcy Sale Transaction.

61.     Upon consummation of the sale between NRG and GIP, day-to-day management and operation of Plaintiffs and Elkhorn Ridge changed again. Under a new Master Services Agreement between Yield, Yield LLC and Yield Operating and Zephyr Renewables, LLC

("MSA II"), responsibility for the operation and management of "Service Recipients" transferred from NRG to Zephyr Renewables.

62.     Other than the amount of compensation, the terms of the MSA II are comparable to the terms in the MSA.

63.     NPPD has informed Plaintiffs and Third-Party Defendant Elkhorn Ridge, in writing, that they are in default of the PPAs.

## FIRST CAUSE OF ACTION
### Declaratory Judgment
### (Edison Mission Energy Sale to NRG)

64.     NPPD, for its first cause of action against Third-Party Defendant Elkhorn Ridge, incorporates the foregoing paragraphs as if fully set forth herein.

65.     There exists a current and ripe dispute between the parties regarding whether NRG's purchase of Elkhorn Ridge violated Section 10.2 ("Permitted Transactions") of the Elkhorn Ridge PPA, thereby constituting an event of default and authorizing NPPD to terminate the PPA.

66.     NPPD, as a party to the Elkhorn Ridge PPA, seeks a declaration of its rights and obligations under the Elkhorn Ridge PPA.

67.     A declaration of the parties' respective rights would terminate the parties' dispute.

68.     NPPD seeks a declaration from this Court, pursuant to 28 U.S.C Section 2201, that:

    a.  Edison Mission Energy's sale of Elkhorn Ridge to NRG constituted a "Transaction" for purposes of Section 10.2.1 ("Permitted Transactions") of the Elkhorn Ridge PPA;

    b.   NRG Energy, Inc. and NRG Energy Holdings, Inc., were not Affiliates of

        Edison Mission Energy for purposes of Section 10.2.1 ("Permitted

        Transactions") of the Elkhorn Ridge PPA;

    c.   NPPD did not provide written consent to the sale between Edison Mission

        Energy and NRG;

    d.   Elkhorn Ridge's failure to obtain NPPD's written consent constitutes an Event

        of Default under Section 13.2 ("Events of Default by Seller") of the Elkhorn

        Ridge PPA;

    e.   NPPD has the right to terminate the Elkhorn Ridge PPA under Section of 13.3

        ("Termination for Cause") as a result of Elkhorn Ridge's Events of Default.

### SECOND CAUSE OF ACTION
**Breach of Contract**
**(Edison Mission Energy Sale to NRG)**

69.    NPPD, for its second cause of action against Third-Party Defendant Elkhorn

Ridge, incorporates the foregoing paragraphs as if fully set forth herein.

70.    NPPD and Elkhorn Ridge were parties to a valid and binding contract for the sale

and purchase of power generated by Elkhorn Ridge.  The contract is referred to as the Elkhorn

Ridge PPA.

71.    Elkhorn Ridge breached the PPA by consummating a transaction, namely the sale

of Edison Mission Energy to NRG, without the consent and approval of NPPD.

72.    Section 13.4 of the Elkhorn Ridge PPA specifically sets forth that the declaration

of a default and termination of the PPA is not an exclusive remedy and "shall not be deemed as a

waiver or relinquishment by the terminating Party of any of its other rights or remedies,

including any right to recover damages for any breach of this Agreement or for any unperformed

balance."  (Elkhorn Ridge PPA, § 13.4)

73.    As a direct and proximate result of Elkhorn Ridge's breach, NPPD has suffered

past and future damages.

<u>THIRD CAUSE OF ACTION</u>
**Breach of Contract**
**(Elkhorn Ridge's Abdication of Operations and Management)**

74.    NPPD, for its third cause of action against Third-Party Defendant Elkhorn Ridge,

incorporates the foregoing paragraphs as if fully set forth herein.

75.    NPPD and Elkhorn Ridge were parties to a valid and binding contract for the sale

and purchase of power generated by Elkhorn Ridge

76.    Elkhorn Ridge breached the PPA by failing to fulfill its contractual duty to

"operate and maintain the Plant and Site." Instead, it abdicated its responsibilities and turned

over the day-to-day operations and management to a third party with whom NPPD has no

contractual agreement.

77.    As a direct and proximate result of Elkhorn Ridge's breach, NPPD has suffered

past and future damages.

<u>FOURTH CAUSE OF ACTION</u>
**Declaratory Judgment**
**(NRG Sale to GIP)**

78.    NPPD, for its fourth cause of action against Third-Party Defendant Elkhorn

Ridge, incorporates the foregoing paragraphs as if fully set forth herein.

79.    There exists a current and ripe dispute between the parties regarding whether

GIP's purchase of Elkhorn Ridge violated Section 10.2 ("Permitted Transactions") of the

Elkhorn Ridge PPA, thereby constituting an event of default and authorizing NPPD to terminate the Elkhorn Ridge PPA.

80.    NPPD, as a party to the Elkhorn Ridge PPA, seeks a declaration of its rights and obligations under the Elkhorn Ridge PPA.

81.    A declaration of the parties' respective rights would terminate the parties' dispute.

82.    NPPD seeks a declaration from this Court, pursuant to 28 U.S.C Section 2201, that:

      a.   NRG's sale of Elkhorn Ridge to GIP constituted a "Transaction" for purposes of Section 10.2.1 ("Permitted Transactions") of the Elkhorn Ridge PPA;

      b.   GIP was not Affiliate of Edison Mission Energy for purposes of Section 10.2.1 ("Permitted Transactions") of the Elkhorn Ridge PPA;

      c.   NPPD did not provide written consent to the sale between NRG and GIP;

      d.   Elkhorn Ridge's failure to obtain NPPD's written consent constitutes an Event of Default under Section 13.2 ("Events of Default by Seller") of the Elkhorn Ridge PPA;

      e.   NPPD has the right to terminate the Elkhorn Ridge PPA under Section of 13.3 ("Termination for Cause") as a result of Elkhorn Ridge's Events of Default.

**<u>FIFTH CAUSE OF ACTION</u>**
**Breach of Contract**
**(NRG Sale to GIP)**

83.    NPPD, for its fifth cause of action against Third-Party Defendant Elkhorn Ridge, incorporates the foregoing paragraphs as if fully set forth herein.

84.    NPPD and Elkhorn Ridge were parties to a valid and binding contract for the sale and purchase of power generated by Elkhorn Ridge.  The contract is referred to as the Elkhorn Ridge PPA.

85.    Elkhorn Ridge breached the PPA by consummating a transaction, namely the sale of NRG to GIP, without the consent and approval of NPPD.

86.    Section 13.4 of the Elkhorn Ridge PPA specifically sets forth that the declaration of a default and termination of the PPA is not an exclusive remedy and "shall not be deemed as a waiver or relinquishment by the terminating Party of any of its other rights or remedies, including any right to recover damages for any breach of this Agreement or for any unperformed balance."  (Elkhorn Ridge PPA, § 13.4)

87.    As a direct and proximate result of Elkhorn Ridge's breach, NPPD has suffered past and future damages.

**SIXTH CAUSE OF ACTION**
**Breach of Contract**
**(Elkhorn Ridge's Continued Abdication of Operations and Management)**

88.    NPPD, for its sixth cause of action against Third-Party Defendant Elkhorn Ridge, incorporates the foregoing paragraphs as if fully set forth herein.

89.    NPPD and Elkhorn Ridge were parties to a valid and binding contract for the sale and purchase of power generated by Elkhorn Ridge

90.    Elkhorn Ridge breached the PPA by failing to fulfill its contractual duty to "operate and maintain the Plant and Site." Instead, after it abdicated its responsibilities by turning over the day-to-day operations and management of the wind farm to NRG, Elkhorn Ridge against refused to satisfy its contractual obligations.

91.     After NRG sold its interest in NRG Yield to GIP, Elkhorn Ridge again turned over control and management of the site. This time it was to Zephyr Renewables.

92.     As a direct and proximate result of Elkhorn Ridge's breach, NPPD has suffered past and future damages.

WHEREFORE, NPPD prays that the Court declare and determine that the 2014 and 2018 sales constituted Transactions for purposes of the Elkhorn Ridge PPA; that in each Transaction, the buyer was not an Affiliate of Edison Mission Energy; that Elkhorn Ridge failed to obtain NPPD's written consent to the Transactions; that the absence of NPPD's written consent constituted an Event of Default under the PPA; and as a result of Elkhorn Ridge's Events of Default, NPPD is lawfully authorized to terminate the Elkhorn Ridge PPA.  NPPD further prays that the Court award NPPD its costs in this action, and for such other relief as the Court deems just and proper.

## JURY DEMAND

NPPD Demands a Jury Trial on all issues triable to a jury under the law.

## LOCATION OF TRIAL

NPPD requests that trial be held in Omaha, Nebraska.

NEBRASKA PUBLIC POWER DISTRICT,
Defendant, Counterclaimant, and Third-Party
Plaintiff,


BY:   s/William M. Lamson, Jr.
        William M. Lamson, Jr., #12374
        Brian J. Brislen, #22226
        Cathy S. Trent-Vilim, #22489
        Michael L. Storey, #24960
        Lamson, Dugan & Murray, LLP
        10306 Regency Parkway Drive
        Omaha, NE 68114-3743
        Tel: 402-397-7300
        Fax: 402-397-7824
        wlamson@ldmlaw.com
        bbrislen@ldmlaw.com
        ctrent-vilim@ldmlaw.com
        mstorey@ldmlaw.com


### CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2019, I electronically filed the foregoing First Amended Third Party Complaint with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the attorneys listed below.

Steven D. Davidson
Kenneth W. Hartman
Spencer R. Murphy
BAIRD HOLM, LLP
1500 Woodmen Tower
1700 Farnam Street
Omaha, NE  68102

There are no participants to send the foregoing pleading by United States Postal Service.


s/William M. Lamson, Jr.

#692327