**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| LAREDO RIDGE WIND, LLC; BROKEN BOW WIND, LLC; and CROFTON BLUFFS WIND, LLC | Case No. 8:19-cv-45 |
|     Plaintiffs and Counterclaim Defendants, | **BRIEF IN SUPPORT OF PROJECT ENTITIES' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| NEBRASKA PUBLIC POWER DISTRICT, | |
|     Defendant, Counterclaim Plaintiff and Third-Party Plaintiff | |
| v. | |
| ELKHORN RIDGE WIND, L.L.C., a Delaware Limited Liability Company, | |
|     Third-Party Defendant. | |

The Plaintiffs, Laredo Ridge Wind, LLC ("Laredo"), Broken Bow Wind, LLC ("Broken Bow"), and Crofton Bluffs Wind, LLC ("Crofton"), and the Third-Party Defendant Elkhorn Ridge Wind, L.L.C. ("Elkhorn") (together the "Project Entities"), submit this brief in support of their Motion for Summary Judgment on all claims, counterclaims, and third-party claims raised in this action by both the Project Entities and by the Defendant, Nebraska Public Power District ("NPPD"). As a matter of law, there has been no breach of the unambiguous terms of the Power Purchase Agreements ("PPAs") by the Project Entities, a trial is not needed to resolve any disputed fact, and summary judgment is therefore appropriate.

## **PROCEDURAL BACKGROUND**

This action was originally brought by three of the Project Entities to obtain immediate injunctive relief to preserve the viability of their wind energy facilities as a going concern, which had been placed in jeopardy by NPPD's threatened wrongful termination of the PPAs.   Rather than oppose the Project Entities' Motion for a Temporary Restraining Order and Preliminary Injunction, NPPD stipulated to the entry of the requested injunctive relief prohibiting NPPD's termination of the PPAs pending resolution of the case on the merits.

NPPD then answered and filed counterclaims against each Plaintiff, originally seeking only declaratory relief concerning its contention that sales of equity interests as low as 22% in remote, upstream parent affiliates of the Plaintiffs, affiliates separated from Plaintiffs by multiple intermediate ownership tiers, constituted a breach of provisions in the PPAs requiring NPPD's consent to the transfer or sale of a "*majority* of the *direct* ownership interests" of the Plaintiff LLCs.   NPPD also filed a third-party complaint seeking identical declaratory relief against a fourth and similarly situated project entity, Elkhorn, which answered and filed its own counterclaim for injunctive and declaratory relief on the same grounds as the original Plaintiffs' claims.

NPPD later amended its counterclaim and third-party claim, adding causes of action for breach of contract on the prohibited transfer issue already the subject of its claim for declaratory relief.   NPPD's amended pleadings also added a second and new theory of breach, alleging that responsibility for operation and management of the wind facilities changed with each sale of upstream ownership interests, and that such alleged "abdication of operations and management" by the Project Entities breached a provision

in the PPAs that the Project Entities "intend to construct, solely own, finance, operate and maintain the Plant and Site in a manner which will at all times meet the requirements of this Agreement."

NPPD's two theories of breach are without merit as a matter of law under the unambiguous terms of the PPAs.  The transactions at issue did not involve the sale of a majority of the direct ownership interests in the Project Entities, and therefore did not require NPPD's consent.   Operation and management of the facilities has always remained under the control of the members and officers of the Project Entities, who were free under the terms of the PPAs and applicable law to delegate performance to third parties, while retaining liability to NPPD for the proper performance of those contractual obligations.   In the alternative, NPPD has waived all of its claims by accepting the Project Entities' ongoing performance under the PPAs notwithstanding NPPD's concurrent knowledge of the facts upon which its claims of breach are now premised.  The Project Entities are therefore entitled to summary judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

In accordance with NECivR 56.1, the Project Entities provide the following statement of material facts about which there is no genuine issue to be tried.

A.   **The Parties**

1.     Laredo owns and operates a wind energy generation facility located in Boone County, Nebraska.  The facility is comprised of 54 wind turbines and related equipment and improvements, with a capacity of approximately 80 megawatts.  Doc. 10-1, January 29, 2019 Declaration of Randall Hickok, ¶2 (hereafter "First Hickok Dec.").

2.      Laredo is a limited liability company organized under Delaware law. Laredo's sole member is Mission Wind Laredo, LLC.   There are numerous additional parent tiers of ownership above Laredo, the nearest of which to Laredo that are not also limited liability companies are Clearway Energy, Inc., a Delaware corporation with its principal place of business in Princeton, New Jersey, and GIP III Zephyr Acquisition Partners, LLP, a limited liability partnership in which none of the general or limited partners are residents or citizens of the State of Nebraska.  None of the non-LLC or partnership ownership interests upstream from Laredo are residents or citizens of the State of Nebraska. First Hickok Dec., ¶3.

3.      Laredo's Fourth Amended and Restated Limited Liability Company Agreement provides that management of the business and affairs of the Company shall be vested in a Manager, which is the Board, or so long as there is only one member of the Company, the Board or the sole member, at the sole member's option.  Laredo is managed by its sole member, Mission Wind Laredo, LLC. December 18, 2019 Declaration of Randall Hickok, ¶15 (hereafter "Second Hickok Dec.").

4.      Mission Wind Laredo, LLC, as Manager, has appointed several officers with authority to execute contracts on behalf of the Company. Second Hickok Dec. ¶16.

5.      Laredo and NPPD entered into a PPA dated February 5, 2010.  First Hickok Dec., ¶3, Ex. 1 (hereafter "Laredo PPA").

6.      Broken Bow owns and operates a wind energy generation facility located in Custer County, Nebraska.  The facility is comprised of 50 wind turbines and related equipment and improvements, with a capacity of approximately 80 megawatts. First Hickok Dec., ¶5.

7.     Broken Bow is a limited liability company organized under Delaware law. Broken Bow's sole member is Mission Wind Broken Bow, LLC.  There are numerous additional parent tiers of ownership above Broken Bow, the nearest of which to Broken Bow that is not also a limited liability company is Capistrano Wind Holdings, Inc., a Delaware corporation with its principal place of business in the State of California. None of the non-LLC or partnership ownership interests upstream from Broken Bow are residents or citizens of the State of Nebraska. First Hickok Dec., ¶6.

8.     Broken Bow's Second Amended and Restated Limited Liability Company Agreement provides that management of the business and affairs of the Company shall be vested in a Manager, which is either the Board, or so long as there is only one member of the Company, the Board or the sole member, at the sole member's option. Broken Bow is managed by its sole member, Mission Wind Broken Bow, LLC. Second Hickok Dec., ¶18.

9.     Mission Wind Broken Bow, LLC, as Manager, has appointed several officers with authority to execute contracts on behalf of the Company. Second Hickok Dec., ¶19.

10.    Broken Bow and NPPD entered into a PPA dated September 22, 2010. First Hickok Dec., ¶7, Ex. 2 (hereafter "Broken Bow PPA").

11.    Crofton owns and operates a wind energy generation facility located in Knox County, Nebraska.  The facility is comprised of 20 wind turbines and related equipment and improvements, with a capacity of approximately 42 megawatts. First Hickok Dec., ¶8.

5

12.     Crofton is a limited liability company organized under Delaware law. Crofton's sole member is Mission Wind Crofton Bluffs, LLC.   There are numerous additional parent tiers of membership above Crofton, the nearest of which to Crofton that is not also a limited liability company is Capistrano Wind Holdings, Inc., a Delaware corporation with its principal place of business in the State of California.   None of the non-LLC or partnership ownership interests upstream from Crofton are residents or citizens of the State of Nebraska. First Hickok Dec., ¶9.

13.     Crofton's Second Amended and Restated Limited Liability Company Agreement provides that management of the business and affairs of the Company shall be vested in a Manager, which is either the Board, or so long as there is only one member of the Company, the Board or the sole member, at the sole member's option. Crofton is managed by its sole member, Mission Wind Crofton Bluffs, LLC.   Second Hickok Dec., ¶21.

14.     Mission Wind Crofton Bluffs, LLC, as Manager, has appointed several officers with authority to execute contracts on behalf of the Company. Second Hickok Dec., ¶22.

15.     Crofton and NPPD entered into a Second Restated and Amended PPA dated effective as of April 23, 2008. First Hickok Dec., ¶10, Ex. 3 (hereafter "Crofton PPA").

16.     Elkhorn owns and operates a wind energy generation facility located in Knox County, Nebraska.   The facility is comprised of 27 wind turbines and related equipment and improvements, with a capacity of approximately 80 megawatts. Second Hickok Dec., ¶2.

6

17.     Elkhorn is a limited liability company organized under Delaware law. Elkhorn's two members are Elkhorn Holdings, LLC and Tenaska Elkhorn Ridge I, LLC, the latter of which has members that are citizens of the State of Nebraska. Second Hickok Dec., ¶24.

18.     Elkhorn's Second Amended and Restated Limited Liability Company Operating Agreement provides that the business and affairs of the Company shall be managed by a Management Committee consisting of two directors, one of whom is designated by each of the two members of the Company. Second Hickok Dec., ¶25.

19.     Elkhorn's Management Committee has appointed several officers with authority to execute contracts on behalf of the Company. Second Hickok Dec. ¶26.

20.     Elkhorn and NPPD entered into a PPA dated February 27, 2008. Second Hickok Dec., ¶3, Ex. 1(hereafter "Elkhorn PPA," and together with the Laredo PPA, Broken Bow PPA, and Crofton PPA, the "PPAs").

21.     Each Project Entity was developed utilizing a complex, multi-tier affiliate ownership structure, with the individual project operating entity standing alone at the bottom tier.   The ownership structure was largely a function of the syndication of multiple wind energy projects necessary for financing purposes, and to take advantage of available federal tax credits and other incentives.  First Hickok Dec., ¶¶ 11, 19.

22.     NPPD is a Nebraska political subdivision and public power district, and is Nebraska's largest electric utility. NPPD's First Amended Third-Party Complaint, ¶1 (hereafter "Amended Complaint"); NPPD's First Amended Counterclaim, ¶33 (hereafter "Amended Counterclaim").

7

**B.**     **Jurisdiction and Venue**

23.     The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 over the Complaint filed by Laredo, Broken Bow and Crofton Bluffs, as well as the counterclaims filed by Defendant NPPD, because there is complete diversity and the amount placed at issue by those claims each exceed $75,000.00. Amended Complaint, ¶3; Amended Counterclaim, ¶37.

24.     The Court may exercise supplemental jurisdiction over NPPD's Third-Party Complaint pursuant to 28 U.S.C. § 1367, as the Complaint, NPPD's Counterclaims, NPPD's Third-Party Complaint, and Elkhorn's Counterclaims share and derive from a common nucleus of operative facts, and there are dispositive common issues of law. Amended Complaint, ¶4; Amended Counterclaim, ¶39.

25.     Under 28 U.S.C. § 1367(b), exercising supplemental jurisdiction would not destroy diversity jurisdiction notwithstanding the fact that Elkhorn is a Nebraska citizen, because the Defendant, NPPD, initiated the third-party claim as a Third-Party Plaintiff. Amended Complaint, ¶5.

26.     Venue is proper in the District of Nebraska.  The Project Entities and NPPD have each entered into a written contract to be performed in the State of Nebraska, the terms of which are the subject of this dispute. Amended Complaint, ¶6; Amended Counterclaim, ¶38.

**C.**     **The PPAs**

27.     The PPAs each provided for NPPD's purchase of all energy produced by each Project for a period of 20 years, at guaranteed pre-determined pricing that gradually increases each year.  PPAs, §§ 3.1, 5.2.1.

28.    The execution of a long-term PPA is a critical aspect of wind energy project development, necessary to obtain financing and other required prerequisites for construction and operation of the facility.   First Hickok Dec., ¶11; Second Hickok Dec., ¶4.

29.    With a PPA in force, each Project successfully reached commercial operation.   NPPD has been purchasing all the power produced by each Project continuously since commercial operation began, a period of at least six years in each instance.  First Hickok Dec., ¶12; Second Hickok Dec., ¶5.

30.    The PPAs contain materially identical provisions addressing "Reorganizations, Transfers, Sales of Assets and Assignments by Seller," describing various transactions that may or may not be undertaken by the "Seller" of power under the PPAs, defined in the opening paragraph of the PPAs to be each Project Entity.  The provision at issue, found at Section 10.2 of the PPAs, provides in relevant part as follows:

**10.2  Permitted Transactions**

10.2.1    Seller [the Project Entity] shall not:  (a) consolidate or merge with any other Person, or reorganize, consolidate, Change Control or change the form of Seller's business organization from a limited liability company; or, (b) sell, transfer, lease, transfer by operation of Law, or otherwise dispose of the Site or Plant or any unit thereof or all or substantially all of Seller's assets …, or (c) assign this Agreement, or any of its rights or obligations under this Agreement (each, a "Transaction") to any Person (the "Transferee"), whether in a single transaction or series of transactions, unless such Transaction is expressly approved in writing by NPPD … and any Transaction in the absence of such required approval shall be void and of no legal effect.

* * *

10.2.3    "Change Control" means the sale or transfer after the Effective Date of _a majority of the direct ownership interests in Seller_ but excludes

transfers to Affiliates of Edison Mission Energy, the enforcement of liens on such ownership interests (and sales or transfers by Seller Lenders) permitted by Section 20.11, transfers to establish or maintain qualification as a C-BED Project, transfers of ownership interests among the owners of Seller and transfers due to the death of individual owners. Affiliates of Edison Mission Energy shall mean any other Person that controls, is under the control of, or is under common control with, Edison Mission Energy. The term "control" (including the terms "controls", "under the control of" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management of the policies of a Person, whether through ownership interest, by contract or otherwise.

PPAs, § 10.2 (emphasis added).

31.   The PPAs each include a waiver of NPPD's right to exercise its eminent domain powers over the Projects during the term of the PPAs. PPA, § 10.1.

32.   The PPAs give NPPD a right to acquire the Project assets during year 11 of the contract (when federal tax credits expire), but "at a price and terms acceptable to the Seller and NPPD." *Id.* Thus, during the term of the PPAs, NPPD could acquire the Projects only upon a successful negotiation of price and terms with the Project Entities.

33.   Section 10.1 of each PPA also provides that NPPD's waiver of its eminent domain powers ends if the PPA is "terminated or cancelled due to Seller's breach or Event of Default." *Id.* Accordingly, if NPPD terminates the PPAs as intended, it will obtain the legal right to acquire each Project by eminent domain, at post-termination fair market value.

34.   Section 10 of the PPAs recognizes the importance of these transfer provisions to both sides of the transaction, stating that a "failure or threatened failure to comply with the terms of this Section 10 may cause irreparable injury" and that each party "shall have the right to obtain from any competent court a decree enjoining such breach or threatened breach of this Section 10." PPA, § 10.3.

10

35.     Section 4.2 of the PPAs governing Laredo, Broken Bow and Crofton provide as follows:

> Subject to NPPD's rights under this Agreement, Seller intends to construct, solely own, finance, operate and maintain the Plant and Site in a manner which will at all times meet the requirements of this Agreement. Without limiting the generality of the foregoing, Seller shall provide NPPD each business day after the connection to NPPD Interconnection Facilities the operating conditions and scheduled maintenance of the Plant and coordinate in accordance with Prudent Utility Practice scheduled maintenance to minimize any problem such maintenance may impose on the electric transmission system operations of NPPD. In all events, Seller agrees that it will use Commercially Reasonable Efforts in the construction, operation and maintenance of the Plant.
>
> Laredo PPA, § 4.2; Broken Bow PPA, § 4.2; Crofton PPA, § 4.2.

36.     Section 4.2 is identical in the PPA governing Elkhorn, except that the word "finance" does not appear in the first sentence. Elkhorn PPA, § 4.2.

## D.     **The Transactions**

37.     Edison Mission Energy ("EME"), the original indirect owner of the Project Entities, filed for bankruptcy protection in 2012. *In re Edison Mission Energy,* Case No. 12-49219 (Bankr. N.D. Ill. 2012).

38.     In April of 2014, affiliates of NRG Energy, Inc. ("NRG") acquired from EME equity interests in distant parent companies of the Project Entities, together with those of many other EME subsidiary project companies, in a transaction approved by the bankruptcy court (the "NRG Acquisition"). First Hickok Dec., ¶13, Ex. 5; Second Hickok Dec., ¶6, Ex. 2.

39.     In the NRG Acquisition, with respect to Laredo, Broken Bow, and Crofton, membership interests in their upstream affiliate Edison Mission Energy were acquired by NRG Energy Gas & Wind Holdings, Inc. Declaration of Steven D. Davidson

11

(hereafter "Davidson Dec."), ¶2, Ex. 1, Laredo Deposition (hereafter "Laredo Dep."), 19:22-20:1, Ex. 25; Davidson Dec., ¶2, Ex. 2, Broken Bow Deposition (hereafter "Broken Bow Dep."), 6:7-11, Ex. 54; Davidson Dec., ¶2, Ex. 3, Crofton Deposition (hereafter "Crofton Dep."), 9:9-19, Ex. 49.

40.    In the NRG Acquisition, with respect to Elkhorn, membership interests in its upstream affiliate Viento Funding II, LLC, were acquired by NRG Energy Gas & Wind Holdings, Inc. Davidson Dec., ¶2, Ex. 4, Elkhorn Deposition (hereafter "Elkhorn Dep."), 8:22-9:9, Ex. 39.

41.    In the NRG transaction, only membership interests in entities other than the Project Entities were sold, entities upstream of the Project Entities by many tiers of intermediate ownership.  The direct membership interests of the Project Entities were not sold, transferred, or otherwise changed.  Laredo Dep., 19:22-20:1, Ex. 25; Broken Bow Dep., 6:7-11, Ex. 54; Crofton Dep., 9:9-19, Ex. 49; Elkhorn Dep., 8:22-9:9, Ex. 39.

42.    In the NRG transaction, there were no assets of Project Entities that changed ownership, nor were any contracts assigned.  In particular, the PPAs were neither amended nor assigned.  Davidson Dec., ¶2, Ex. 5, Caryl Karnick Deposition ("Karnick Dep."), 35:1-36:7.

43.    In the NRG transaction, with respect to Crofton and Broken Bow, NRG acquired only 22% of non-voting parent equity of Project Entities' upstream affiliate. First Hickok Dec., ¶21, Ex. 9, 10; Crofton Dep., Ex. 49; Broken Bow Dep., Ex. 54.

44.    In August of 2018, an affiliate of a private equity firm, GIP III Zephyr Acquisition Partners, LLP ("GIP"), acquired equity interests in distant parent companies of the Project Entities from NRG, together with those of many other NRG subsidiary

project companies (the "GIP Acquisition").  Laredo Dep., 24:2-4, Ex. 25; Elkhorn Dep., 15:24-16:2, Ex. 39; Crofton Dep., 12:12-25, Ex. 49; Broken Bow Dep., Ex. 54.

45.    In the GIP Acquisition, with respect to all four Project Entities, their upstream affiliate Zephyr Renewables LLC (formerly known as NRG Renewables LLC) was acquired by GIP III Zephyr Acquisition Partners, L.P.  After closing, Zephyr Renewables LLC was renamed to Clearway Energy Group LLC.  Laredo Dep., 24:20-25:7, Ex. 25; Elkhorn Dep., Ex. 39; Crofton Dep., Ex. 49; Broken Bow Dep., Ex. 54.

46.    In the GIP transaction, only membership interests in entities other than the Project Entities were sold, entities upstream of the Project Entities by many tiers of intermediate ownership.  The direct membership interests of the Project Entities were not sold, transferred, or otherwise changed.  First Hickok Dec., ¶16, Ex. 6; Laredo Dep., Ex. 25; Elkhorn Dep., Ex. 39; Crofton Dep., Ex. 49; Broken Bow Dep., Ex. 54.

47.    In the GIP transaction, there were no assets of Project Entities that changed ownership, nor were any contracts assigned.  In particular, the PPAs were neither amended nor assigned.  First Hickok Dec., ¶22; Second Hickok Dec., ¶10; Karnick Dep., 19:20-24, 35:1-36:7, 38:5-10, Ex. 14.

48.    In the GIP transaction, with respect to Crofton and Broken Bow, GIP acquired only 22% of non-voting parent equity of the Project Entities' upstream affiliate.  First Hickok Dec., ¶21, Exs. 9, 10; Crofton Dep., 8:13-15, 11:23-25, Ex. 49; Broken Bow Dep., Ex. 54.

**E.    NPPD's Knowledge of and Response to the Transactions**

49.    NPPD had actual knowledge of the NRG Acquisition at or near the time it closed in 2014.  First Hickok Dec., ¶15.

13

50.    NPPD has since had actual knowledge of and executed documents in connection with an exchange of letters of credit that took place after the NRG Acquisition.  *Id.*; Karnick Dep., 28:15-19, Ex. 14.

51.    NPPD made no concurrent objection to the NRG Acquisition or to the exchange of letters of credit, and NPPD has continued to perform its obligations under the PPAs continuously since 2014, buying all the power produced by the Projects at contract prices.  First Hickok Dec., ¶15

52.    NPPD had actual knowledge of the execution of the GIP purchase agreement in February of 2018. *Id.*, at ¶30, Ex. 18.

53.    NPPD made no concurrent objection to the GIP Acquisition prior to closing, or for more than five months after the transaction closed. *Id.,* ¶17.

54.    On January 11, 2019, NPPD sent written notice to each Project Entity of an alleged event of default under the PPAs, stating that both the 2014 NRG Acquisition and the 2018 GIP Acquisition were in violation of Section 10.2 of the PPAs.  First Hickok Dec., ¶¶ 24, 25, 26, Ex. 12, 13,14; Second Hickok Dec., ¶12, Ex. 4.

**F.    Impact of Termination of the PPAs Upon the Projects**

55.    Under the terms of financing arrangements in place with the lenders for each Project Entity, termination of the PPA would be an event of default.  First Hickok Dec., ¶¶ 27, 28, 29, Ex. 15 at 99-101, Ex. 16 at 95-96; and Ex. 17 at 95-96; Second Hickok Dec., ¶13, Ex. 15 at 103-105.

56.    Default would trigger a wide range of drastic lender remedies, including the acceleration of project debt and the right to foreclose security interests in Project

assets or ownership interests.  First Hickok Dec., ¶¶ 27, 28, 29, Ex. 15 at 103-104, Ex. 16 at 99-100, Ex. 17 at 98-100; Second Hickok Dec., ¶13, Ex. 15 at 105.

57.     A bankruptcy filing may be the only protection available to the Project Entities if those and other creditor remedies are pursued, resulting in the likely loss of the value of each project as a going concern.  First Hickok Dec., ¶30; Second Hickok Dec., ¶14.

58.     Termination of the PPAs would, in the case of each Project Entity, eliminate the primary contract supporting the financial structure of the Projects.  The PPAs provide certainty and security in each Project's revenue stream for 20 years at predetermined contract pricing.  The loss of that revenue stream, regardless of creditor action, would present a significant risk of project failure.  *Id.*

59.     Termination of the PPAs for an alleged seller default would, in the case of each Project Entity, end NPPD's waiver of its eminent domain powers.  PPAs, § 10.1.

60.     After termination for an alleged seller default, the Projects would face a potential involuntary acquisition by NPPD at a significantly diminished fair market value, due to the fact that the Projects would no longer have a guaranteed revenue stream from the PPAs. *Id.*, at § 10.1, 10.4; First Hickok Dec., ¶30; Second Hickok Dec., ¶14.

## G.     Project Servicing and O&M Contracts

61.     The Project Entities themselves have officers, but do not have any employees. Second Hickok Dec., ¶28.

62.     Laredo has entered into a Services Agreement, dated May 27, 2010 with Clearway Asset Services, LLC, (f/k/a NRG Asset Services LLC, f/k/a Edison Mission

Asset Services, Inc., as assignee from Edison Mission Energy on November 8, 2012) (the "Laredo Services Agreement"). Second Hickok Dec., ¶29, Ex. 14.

63.    Under the Laredo Services Agreement, Laredo engaged an affiliated third party to perform various functions:  a) "Support Services," meaning work related to "planned or actual construction projects including assistance with oversight of engineering, design, procurement, construction, and similar services construction, and similar services as may be necessary in pursuing the Laredo's construction projects;" b) "Administrative Services," meaning "centralized management and administration services," including management, legal, payroll, human resources, accounting, government affairs, tax and other professional services, procurement and administration of an appropriate insurance program, environmental, general procurement and any other similar activity necessary or desirable for Laredo or its business; c) letter of credit services, and d) any additional services specifically requested. Second Hickok Dec., ¶30.

64.    Laredo has entered into an Amended and Restated Operation and Maintenance Agreement, dated December 24, 2015, with Clearway Renewable Operation & Maintenance LLC (f/k/a NRG Renew Operation & Maintenance LLC) (the "Laredo O&M Agreement").  Second Hickok Dec., ¶31, Ex. 15.

65.    Under the Laredo O&M Agreement, Laredo engaged an affiliated third party to perform various functions relating to the wind turbines, including all operational responsibility, all routine maintenance and repair, procurement of parts and supplies, preparation of operating logs, program and procedures, management of warranties,

budgeting, outages, waste, leases monitoring, and a wide range of other functions. Second Hickok Dec., ¶32.

66.    Broken Bow has entered into an Amended and Restated Services Agreement dated February 13, 2012, with Clearway Asset Services LLC (f/k/a NRG Asset Services LLC, f/k/a Edison Mission Asset Services, Inc., as assignee from Edison Mission Energy on November 8, 2012) (the "Broken Bow Services Agreement"). Second Hickok Dec., ¶33, Ex. 16.

67.    Under the Broken Bow Services Agreement, Broken Bow engaged an affiliated third party to perform the same scope of functions as are described in the Laredo Services Agreement. Second Hickok Dec., ¶34.

68.    Broken Bow has entered into a Second Amended and Restated Operation and Maintenance Agreement, dated November 6, 2017, with Clearway Renewable Operation & Maintenance LLC (f/k/a NRG Renew Operation & Maintenance LLC) (the "Broken Bow O&M Agreement"). Second Hickok Dec., ¶35, Ex. 17.

69.    Under the Broken Bow O&M Agreement, Broken bow engaged an affiliated third part to perform the same scope of functions as are described in the Laredo O&M Agreement. Second Hickok Dec., ¶36.

70.    Crofton has entered into an Amended and Restated Services Agreement, dated February 13, 2012, with Clearway Asset Services LLC (f/k/a NRG Asset Services, LLC, f/k/a Edison Mission Asset Services LLC, as assignee from Edison Mission Energy on November 8, 2012) (the "Crofton Services Agreement"). Second Hickok Dec., ¶37, Ex. 18.

71.     Under the Crofton Services Agreement, Crofton engaged an affiliated third party to perform the same scope of functions as are described in the Laredo Services Agreement. Second Hickok Dec., ¶38.

72.     Crofton has entered into a Service and Maintenance Agreement with Vestas-American Wind Technology, Inc., dated as of April 27, 2016 as amended by that certain First Amendment, dated December 5, 2018 (the "Crofton-Vestas Agreement"). Second Hickok Dec., ¶39, Ex. 19.

73.     Under the Crofton-Vestas Agreement, Crofton engaged the manufacturer of the turbines installed at the facility to provide maintenance, diagnostics, repair and replacement services in connection with the turbines. Second Hickok Dec., ¶40.

74.     Crofton has entered into an Amended and Restated Operation and Maintenance Services Agreement dated as of February 13, 2012 with Clearway Renewable Operation & Maintenance LLC (f/k/a NRG Renew Operation & Maintenance LLC, f/k/a Edison Mission Operation & Maintenance, Inc.), as amended by that certain First Amendment, dated as of March 29, 2012 (the "Crofton O&M Agreement"). Second Hickok Dec., ¶41, Ex. 20.

75.     Under the Crofton O&M Agreement, Crofton engaged an affiliated third party to perform the same scope of functions described in the Laredo O&M Agreement, except for those functions being performed by Vestas. Second Hickok Dec., ¶42.

76.     Elkhorn has entered into a Management and Administration Agreement, dated as of May 9, 2008, with Elkhorn Holdings LLC (f/k/a NRG Elkhorn Holdings LLC, f/k/a Edison Mission Midwest, LLC, f/k/a Edison Mission Midwest, Inc.) (the "Elkhorn Service Agreement"). Second Hickok Dec., ¶43, Ex. 21.

77.     Under the Elkhorn Service Agreement, Elkhorn engaged its Manager to provide the same scope of services as are described in the Laredo Services Agreement. Second Hickok Dec., ¶44.

78.     Elkhorn has entered into a Service and Maintenance Agreement with Vestas-American Wind Technology, Inc., dated December 31, 2015 (the "Elkhorn-Vestas Agreement"). Second Hickok Dec., ¶45, Ex. 22.

79.     Under the Elkhorn-Vestas Agreement, Elkhorn engaged the manufacturer of the turbines installed at the facility to provide maintenance, diagnostics, repair and replacement services in connection with the turbines. Second Hickok Dec., ¶46.

80.     Elkhorn has entered into an Amended and Restated Operation and Maintenance Agreement, dated January 1, 2017, with Clearway Renewable Operation & Maintenance LLC (f/k/a NRG Renew Operation & Maintenance LLC) (the "Elkhorn O&M Agreement").  Second Hickok Dec., ¶47, Ex. 23.

81.     Under the Elkhorn O&M Agreement, Elkhorn engaged an affiliated third party to perform the same scope of functions described in the Laredo O&M Agreement, except for those functions being performed by Vestas. Second Hickok Dec., ¶48.

## **ARGUMENT**

## A.     **THE UPSTREAM TRANSACTIONS DID NOT BREACH THE UNAMBIGUOUS TERMS OF THE PPAs.**

In applying the relevant provisions of the PPAs, the Court should implement Nebraska's familiar principles of contract interpretation.

> In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous.  A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings.  If the terms of a contract are clear, a court may not resort to rules of construction.  The

court must accord clear terms their plain and ordinary meaning as an ordinary or reasonable person would understand them.

*Kasel*, 291 Neb. at 232, 865 N.W.2d at 738. Further, "when a contract is unambiguous, the intentions of the parties must be determined from the contract itself." *Facilities Cost Management Group, LLC v. Otoe County School Dist. 66-0111*, 291 Neb. 642, 656, 868 N.W.2d 67, 77 (2015) (citing, *Spanish Oaks, Inc. v. Hy-Vee, Inc.*, 265 Neb. 133, 147, 655 N.W.2d 390, 403 (2003)). In such circumstances, evidence of intention beyond the contract itself may not be considered. "[E]xtrinsic evidence is not permitted to explain the terms of a contract that is not ambiguous." *In re Claims Against Pierce Elevator*, 291 Neb. 798, 825, 868 N.W.2d 781, 80 (2015).

### 1. There was no transfer or sale of a direct ownership interest in the Project Entities

The PPAs clearly and unambiguously described the scope of those transactions that would require NPPD's consent, and the two acquisitions at issue are not within that scope. PPAs, § 10.2; Karnick Dep., 19:20-24. Each transaction was a sale of membership interests in an upstream affiliate, with several tiers of intermediate corporate entities between that affiliate and the Project Entity. First Hickok Dec., ¶16, Ex. 6; Laredo Dep., 19:22-20:1; Broken Bow Dep., 6:7-11; Crofton Dep., 9:9-19. The PPAs did not prohibit such an indirect change in ownership without NPPD's consent, but rather only the sale or transfer of "direct ownership interests" in the Project Entities themselves. PPAs, § 10.2.3.

The PPAs included a provision entitled "Permitted Transactions," which described various events in which the "Seller" of energy under the PPA, defined to be the Project Entities themselves, could not engage without NPPD's consent. PPAs, §

10.2.1.   None has occurred here.   The Project Entities themselves have not been consolidated, merged, reorganized, or changed in form. Karnick Dep., 19:20-24, 35:1-36:7, 38:5-10, Ex. 14.   The Project Entities themselves have not sold, transferred, leased or disposed of any project assets. *Id*.; Laredo Dep., Ex. 25; Elkhorn Dep., Ex. 39; Crofton Dep., Ex. 49; Broken Bow Dep., Ex. 54.   The Project Entities themselves have not assigned the PPAs or any rights under them. Karnick Dep., 35:1-36:7.   On those particular terms of the Permitted Transaction provision, NPPD does not appear to argue otherwise.

Instead, NPPD focuses on the one defined event in the relevant provision: "Change Control."   That defined term "means the sale or transfer after the Effective Date of a majority of the direct ownership interests in Seller …."  PPAs, § 10.2.3.   The provision then excludes from "Change Control" certain transactions between affiliates of the original upstream owner, liens, death of an individual, and other inapplicable events. *Id.*  The exclusions in the provision matter only if the transaction first meets the primary definition involving a sale or transfer of the direct ownership interests of the Project Entity itself. *Id.*  If there was no such sale or transfer of a direct ownership interest of the Project Entity itself, the transaction is not within the scope of "Change Control" and NPPD's consent was not required, regardless of the exclusions.   The phrase "direct ownership interest" is unambiguous, and does not, as a matter of law, reach the indirect sales that took place here through the transfers of ownership in upstream affiliates, separated from the Project Entities by multiple tiers of intermediary corporate ownership.

Case law from many contexts supports that conclusion.   The United States

Supreme Court specifically discussed the difference between direct and indirect ownership of corporate interests in *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003). There, the Court considered removal jurisdiction when entities collectively referred to as "the Dead Sea Companies" sought removal under 28 U.S.C. § 1441(d), claiming they qualified as instrumentalities of a foreign state under the Foreign Sovereign Immunities Act of 1976 ("FSIA").   *Dole*, 538 U.S. at 472.   FSIA defined an instrumentality as an entity "whose shares or other ownership interest is owned by a foreign state …." *Id.*, at 473.   The Dead Sea Companies alleged that such ownership existed in its case by the State of Israel, though Israel actually held interests in upstream entities.   "[T]hese companies were, at various times, separated from the State of Israel by one or more intermediate corporate tiers." *Id.*

The Court held that ownership of "indirect subsidiaries" did not meet the FSIA definition of "owned by a foreign state," because "only direct ownership of a majority of shares by the foreign state satisfies the statutory requirement." *Id.*, at 474.   In considering the meaning of the term "ownership," the Court determined that it could not "ignore corporate formalities and use the colloquial sense of the term."   *Id.*   Finding instead that "corporate law structure often matters," the Court looked to several "basic tenet[s]" of corporate law to support its conclusion.   First, the Court observed that "the corporation and its shareholders are distinct entities."   *Id.*   As such, "[a]n individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets and, as a result, does not own subsidiary corporations in which the corporation holds an interest."   *Id.*, at 475, *citing* 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 31, at 514 (rev. ed. 1999).   Applying that concept to a multi-tier corporate structure,

the Court explained that "[a] corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary; and, it follows with even greater force, the parent does not own or have legal title to the subsidiaries of the subsidiary." *Id.*

The Court likewise rejected the contention that a corporate parent's control over the operations of an indirect subsidiary "may be substituted for an ownership interest." *Id.* at 477. Noting that control and ownership "are distinct concepts," the Court held that "majority ownership by a foreign state, not control, is the benchmark of instrumentality status." *Id.* The Court also supported its conclusion by reference to a wide range of other federal statutes that refer to both "direct and indirect ownership," concluding that Congress knew and understood the difference when it referenced only an "ownership interest" in the FSIA. *Id.* at 476. The Court said that to hold otherwise would effectively pierce the corporate veil, which should be the "rare exception, applied in the case of fraud or certain other exceptional circumstances." *Id.*, at 475. In sum, the Supreme Court concluded that the meaning of direct ownership plainly excludes a subsidiary relationship "separated . . . by one or more intermediate corporate tiers." *Id.*, at 474.

The Eastern District of Virginia reached a similar result in a different federal statutory context in *Fox v. Portico Realty Services Office,* 739 F.Supp.2d 912 (E.D. Va. 2010). There, the Court considered the meaning of a statutory exception to Title VII liability for certain Alaska Native Corporations, defined to include entities "in which the Native Corporation owns not less than 25 per centum of the equity." *Id.*, at 916. The Court rejected the contention that a Native Corporation's ownership interest in an upstream subsidiary of the defendant employer could trigger the exception. "[A] Native

Corporation's indirect ownership in a subsidiary is insufficient to trigger the statutory exception …." *Id.* In so holding, the Court relied both on the corporate formality concepts described in *Dole Foods*, and on the fact that other portions of the statute at issue made specific reference to "both direct and indirect subsidiary corporations." *Id.* The Court found the statutory exception unavailable because the Native Corporation "does not hold a *direct* ownership stake in Portico. Instead, NANA Regional Corporation can only be said to own Portico *indirectly."  Id.* Such an "indirect, twice-removed corporate relationship" did not meet the statutory requirement of direct ownership. *Id.*

The same outcome was reached in a contractual context in an unpublished opinion from the Minnesota Court of Appeals, *Seed v. Astra Genstar P'ship*, No. C2-02-1143, 2003 WL 178790 (Minn. Ct. App. Jan. 28, 2003). There, an option agreement for the sale of real estate included a change of control provision altering the option "if there is a change in the direct ownership of 50% or more of the voting and equity interests" of the developer. *Id.*, at *1. When there was a later ownership change not of the developer entity itself, but of the developer's parent entity, the plaintiff contended that the change of control provision had been triggered. *Id.*

The Court disagreed, holding that "no change in the direct ownership of [the developer] occurred because there was no change in the owner of [the developer's] 'membership interests.'" *Seed*, 2003 WL 178790, at *4. The Court found the contractual phrase "direct ownership" unambiguous, referencing the Black Law Dictionary definition of "direct": "immediate; proximate; by the shortest course; without circuity; operating by an immediate connection or relation, instead of operating through a medium; the

opposite of indirect."  *Id.*, at *3.  The Court also referenced several Minnesota corporate statutes that defined the term "ownership interests" to mean "shares in the case of a corporation or foreign corporation and membership interests in the case of a domestic or foreign limited liability company."  *Id.*, at *4 (*quoting* Minn. Stat. § 302A.011).  With that background, the Court found that the phrase "direct ownership" in the option agreement had "one plain, ordinary meaning," concluded that "the word 'direct,' when placed before the word 'ownership,' serves to limit the type of occurrence that would trigger the option."  *Id.*, at *3-4.  The Court held that the sale of membership interests in an upstream affiliate of the developer was not a change in the direct ownership of the developer itself and did not trigger the change of control provision.  *Id.*

In many other instances, courts and legislatures have often recognized and implemented the difference between direct and indirect ownership of a corporate entity, honoring the intended outcome of distinct corporate ownership through multi-tiered subsidiaries.  *See Illinois Brick Co. v. Illinois,* 431 U.S. 720, 736 n. 16 (1977) (describing an antitrust rule distinguishing between "direct" purchasers of a good from a price-fixing defendant, and "indirect" purchasers where "the defendant owns or controls the intermediary that sold the goods to the indirect-purchaser plaintiff"); *United States v. Citizens & S. Nat. Bank*, 422 U.S. 86, 138 (1975) ("'indirect' ownership or control merely referred to their exercise derivatively, through an intermediary."); *PWP Xerion Holdings III LLC v. Red Leaf Resources, Inc.,* No. 2017-0235-JTL, 2019 WL 5244778, *9 (Del Chanc. 2019) (describing Delaware corporate statutes that distinguish between direct ownership and ownership held "indirectly, through one or more intermediaries"); *Labelle Mgt v. Treas Dep't*, 315 Mich. App. 23, 36–37, 888 N.W.2d 260, 266 (2016) ("indirect

ownership in MCL 208.1117(6) means ownership *through an intermediary,* not ownership by operation of legal fiction, as defendant urges.") (emphasis in original); *Stonington Partners, Inc. v. Hanvit Bank*, No. 02 CIV. 8213 (MGC), 2003 WL 21505308, at *1 (S.D.N.Y. June 30, 2003) (finding ownership through an intermediary entity is a "form of indirect ownership …."). 

In this case, there was no sale or transfer of a direct ownership interest of any Project Entity in either the 2014 NRG Acquisition or the 2018 GIP Acquisition, because those transactions involved transfers of ownership occurring far upstream from the Project Entities, with multiple intermediaries between the transferred interests and the Project Entities. Karnick Dep., 19:20-24, 35:1-36:7, 38:5-10, Ex. 14; Laredo Dep., Ex. 25; Elkhorn Dep., Ex. 39; Crofton Dep., Ex. 49; Broken Bow Dep., Ex. 54.  The phrase "direct ownership interests" unambiguously excludes such events from the scope of the transactions prohibited without NPPD's consent by Section 10.2 of the PPAs.

Moreover, as was the case in both *Dole* and *Fox,* discussed above, that conclusion is confirmed in this case by the parties' use of the phrase "directly or indirectly" in a different sentence of the same provision. PPAs, § 10.2.3.  The last sentence of Section 10.2.3 of the PPAs confirms that NPPD was well aware of the difference between direct and indirect ownership, as the provision defines the term "control" for purposes of the provision's exclusion to include the possession "directly or indirectly" of the power to control the management of corporate policies. *Id.*  NPPD obviously knew how to incorporate concepts of both direct and indirect ownership into the PPAs, intentionally limiting the corporate tiers at which a prohibited change in ownership could occur, while intentionally broadening another definition within the

26

exclusions to that same section.  Further, because courts may not add content to a contract that the parties elected to exclude, NPPD cannot now successfully assert that the unambiguous term "direct ownership" somehow also includes the much broader concept of "indirect ownership" it used elsewhere.  *See Lang v. Magnolia Petroleum Co.*, 166 Neb. 410, 422, 89 N.W.2d 245, 253 (1958) ("Courts are not at liberty to … add language to that used by the parties and thus change the plain expressed intention of the parties as set out in the contract.").

The 2014 NRG Acquisition and 2018 Clearway Acquisition occurred at multiple tiers above the Project Entities, separated by numerous intermediary entities. Laredo Dep., Ex. 25; Elkhorn Dep., Ex. 39; Crofton Dep., Ex. 49; Broken Bow Dep., Ex. 54. There was no sale or transfer of the direct ownership interests of the Project Entities themselves, and thus no breach of the plain and unambiguous terms of Section 10 of the PPAs.

### 2.    In the case of Broken Bow and Crofton, there was no transfer or sale of a majority interest

The absence of any transfer of a majority interest provides a second, independent basis for finding that Section 10 of the PPAs was not breached by the acquisitions at issue for two of the Project Entities, Broken Bow and Crofton.  As noted, Section 10.2.3 defines the term "Change Control" to require not just a sale or transfer of direct ownership interests, but also of a "majority" of those interests.  PPAs at § 10.2.3. Of course, the 'ordinary meaning of majority is fifty percent plus one.'" *Cottier v. City of Martin*, 604 F.3d 553, 567 (8th Cir. 2010) (citations omitted); *see Pennfield Oil Co. v. Winstrom*, 272 Neb. 219, 222, 720 N.W.2d 886, 892 (2006) (finding 25.27 shares constituted a majority interest when a company had 50 outstanding shares).  The

27

ordinary and customary definition of "majority" is "a number that is more than half of a total; a group of more than 50 percent ….  A majority always refers to more than half of some defined or assumed set."  *Majority*, Black's Law Dictionary (10th ed. 2014).

In the 2014 NRG Acquisition, only a 22 percent stake in non-voting common stock of a parent entity four tiers away from the Broken Bow and Crofton Project Entities was acquired. First Hickok Dec., ¶21, Exs. 9, 10; Crofton Dep., Ex. 49; Broken Bow Dep., Ex. 54.  That same 22% stake was transferred in the 2018 GIP Acquisition, as the latter transaction involved entities even further up the ownership structure.  First Hickok Dec., ¶21, Exs. 9, 10; Crofton Dep., 8:13-15, 11:23-25, Ex. 49; Broken Bow Dep., Ex. 54.  Obviously, the transfer of a 22 percent non-voting interest is not the transfer of a majority interest.  For that reason, as to Broken Bow and Crofton, there are two independent grounds for dismissal of NPPD's claims.

**B.     THE PROJECT ENTITIES WERE FREE TO DELEGATE PERFORMANCE OF THEIR CONTRACTUAL DUTIES UNDER THE UNAMBIGUOUS TERMS OF THE PPAs AND NEBRASKA LAW**

In its amended pleadings, NPPD added a second theory of breach not previously mentioned in its default letters to the Project Entities, in its original counterclaims, nor otherwise previously asserted. Amended Complaint, ¶¶ 74-77, 88-92; Amended Counterclaim, ¶¶ 111-114, 125-129.  Taking a provision in the PPAs entirely out of context, NPPD contends that the Project Entities have "abdicated" an obligation to undertake management and operational responsibility for the wind projects themselves, because those duties were allegedly performed by other parties after each acquisition.  *Id.*  NPPD's theory is misguided under the terms of the PPAs and under basic concepts of contract law, neither of which preclude the Project Entities from delegating

28

performance of their contractual duties to a third party while remaining responsible themselves for the outcome of that performance.

### 1.     The performance of a contractual duty may be delegated

Preliminarily, there is no dispute that each of the Project Entities has complied with corporate formalities in its formation and designation of members, managers and officers.   Each is a Delaware limited liability company. First Hickok Dec., ¶¶ 3, 6, 9; Second Hickok Dec., ¶24.   Three (Laredo, Broken Bow and Crofton) are managed by a sole member; one (Elkhorn) is managed by a management committee composed of representatives of its two members. Second Hickok Dec., ¶¶ 15, 18, 21, 25.    Those managers have each appointed several officers with authority to take action on behalf of the companies, including through the execution of contracts with third parties to perform the various tasks necessary to operate a wind energy facility. *Id.*, ¶¶ 16, 19, 22, 26.

In that setting, Nebraska law is clear about the ability of a contracting party to delegate the performance of duties required by the contract.  There is an important legal distinction between an assignment of all rights under a contract, by which the contracting parties seeks to transfer its complete obligation and be relieved of liability for performance under the contract (which has not occurred here), and a delegation of the performance of a duty under a contract, by which the delegating party engages another to complete a task but remains liable for any lapse in performance of that task (which has occurred here).  The distinction was recognized in *Burnison v Johnston,* 277 Neb. 622, 764 N.W.2d 96 (2009), which involved the validity of a law firm's delegation of the right to collect fees from a client.  Allowing such a delegation notwithstanding the public policy prohibiting assignment of the law firm's duty to provide the legal services for

which it was retained, the Court said "it is important to distinguish between the assignment of contractual rights and the delegation of performance of a duty."  *Id.* at 625-26, 764 N.W.2d at 99.

For that proposition, the court cited to section 318 of the Restatement (Second) of Contracts, entitled "Delegation of Performance of Duty," which provides that "an obligor can properly delegate the performance of his duty to another unless the delegation is contrary to public policy or the terms of his promise."  *Id.* at § 318(1).  In its comments, the Restatement confirms that "delegation of performance is a normal and permissible incident of many types of contracts."  *Id.,* cmt (c).  The Restatement also explains that a contractual promise requires performance by a particular person "only to the extent that the obligee has a substantial interest in having that person perform or control the acts promised," which is the case "only where a substantial reason is shown why delegated performance is not as satisfactory as personal performance."  *Id.* at §318(2) and cmt c.  Finally, the Restatement confirms that such delegation does not "discharge any duty to or liability of the delegating obligor."  *Id.*, at § 318(2) and (3).

Similar concepts have been adopted in the Nebraska Uniform Commercial Code. Section 2-210 provides that "a party may perform his or her duty through a delegate unless otherwise agreed or unless the other party has a substantial interest in having his or her original promisor perform or control the acts required by the contract."  Neb. Rev. Stat. U.C.C. § 2-210(1).  Contract treatises say the same, including the Farnsworth treatise to which the Nebraska Supreme Court cited in *Burnison,* and Corbin on Contracts.  "Modern contract law recognizes the general principle that … performance of contractual duties are delegable."  *Corbin on Contracts, §* 49.1 (rev. 2007).  Courts

30

across the country agree. *See e.g. Barcliff, LLC v. M/V Deep Blue,* 876 F.3d 1063, 1073-74 (11th Cir. 2017) ("[A] party meets its obligations under an agreement when the party's delegate renders performance"); *Swiss Reinsurance America Corp. v. Supervalu, Inc.,* 743 F.Supp.2d 1050, 1057 (D. Minn. 2010) (citation omitted) ("[I]n the absence of a contractual provision to the contrary, an obligor on a contract … may delegate his or her duty to perform under the contract to another, without the consent of the obligee"); *Nelson v. City of Hampton,* 802 N.W.2d 224, 232 (Iowa 2011) ("[T]he general rule [is] that the duty to perform may be delegated).

### 2. The PPAs do not restrict delegation of performance

Neither of the two exceptions to the general rule permitting delegation of duties is present here. First, the parties did not agree otherwise in the PPAs. NPPD's pleadings appear to make that contention, cherry-picking a sentence within Section 4.2 that "Seller intends to construct, solely own, finance, operate and maintain the Plant and Site in a manner which will at all times meet the requirements of this Agreement."[1] PPAs, § 4.2. Nothing about that sentence, or the section of the Agreement in which it appears, means that delegation of contractual duties by the Project Entities was prohibited.

The surrounding content of the provision makes clear that the sentence NPPD relies upon is not about *who* will perform, but about the *outcome* of that performance. Section 4 of the PPAs is entitled "Plant," and contains four subsections discussing the timing and performance standards under which the wind facility itself would be constructed and operated. PPAs, § 4. Section 4.1 addresses the timing of completion of plant construction and NPPD's right to information about progress of construction.

---

[1] Section 4.2 of the Elkhorn PPA is the same as the other PPAs, except that it omits the term "finance."

31

PPAs, § 4.1.  Section 4.3 is about permits and approvals, and Section 4.4 requires that the Project Entity provide a substantial letter of credit to NPPD to "assure performance of its obligations." PPAs, §§ 4.3, 4.4.

In between those provisions is Section 4.2, the clear purpose of which is to require that operation and management of the plant be completed in accordance with a designated performance standard. PPAs, § 4.2.  The section requires daily outcome reporting to NPPD and mandates commercially reasonable efforts in producing electricity. *Id.*  The subject of the opening sentence is in its final clause, requiring that the plant be operated "in a manner which will at all times meet the requirements of this Agreement." *Id.*  The clause then provides examples of that performance standard, which were set forth "without limiting the generality of" the performance standard imposed by the opening sentence. *Id.*  The phrase does not say, nor does its surrounding context suggest, that only the Project Entity, and no one else, may perform the tasks necessary to accomplish those performance standards. PPAs, § 4.

NPPD seems to rely on the presence of the word "solely" in the first sentence of Section 4.2. Amended Complaint, ¶39; Amended Counterclaim, ¶74.  However, the word "solely" modifies only the word "own" before which it appears, not the subsequent list of other project activities. PPAs, § 4.2.  That is not only grammatically so, but is made clear from inclusion of the word "finance" in the list of activities, as even NPPD would be hard pressed to contend that it expected the Project Entity itself to finance the tens of millions of dollars needed to construct each facility. *Id.* That the word "solely" modified only the word "own" is also consistent with the Permitted Transaction provision discussed above, which requires NPPD's consent before the direct ownership interests

32

in the Project Entity could be sold or transferred.  The PPA consistently required that ownership remain in the Project Entity itself across both of those provisions, a requirement that has always been fulfilled.  Moreover, it is telling that a sentence similar to that upon which NPPD relies also appears at the beginning of Section 4.1, but omits the word "solely." PPAs, § 4.1.  If the true objective of the section was to address who was to perform, rather than the standards for outcome of that performance, such a lack of consistency in the critical term would not be present.

Finally, the last clause of the Permitted Transaction provision, Section 10.2.4, confirms that the parties did not intend to restrict delegation of performance by the Project Entity.  It states that "no assignment or transfer of this Agreement shall relieve a Party of its obligations hereunder." PPAs, § 10.2.4.  While there was no assignment or transfer of the PPA itself in this case, the provision says nothing that would restrict delegation of duties, and is the logical place where such a restriction would have been set forth if intended.   Instead, the provision confirms the normal rule that any "assignment or transfer" would not relieve the Project Entity from liability for a failure to perform in the manner required by the PPA.  The same is true of the Project Entities' liability to NPPD following its delegation of duties under the PPA, as the parties intended.

Each Project Entity directly owns, and through its manager and officers, is responsible for operation and management of the facility. Laredo Dep., 34:15-23, 36:2-14; Second Hickok Dec., Exs. 6, 8, 10, 12.  Each Project Entity has always remained liable to NPPD for satisfactory performance under the PPAs, including by delivering the promised electricity in compliance with all PPA requirements and performance

standards. First Hickok Dec., ¶22; Second Hickok Dec., ¶10.   To complete that performance, each Project Entity has, since the beginning of the relationship, delegated by contracts with third parties the performance of the various tasks required to accomplish those obligations. Second Hickok Dec., Exs. 7, 9, 11, 13; Laredo Dep., Ex. 24; Elkhorn Dep., Ex. 40; Crofton Dep., Ex. 50; Broken Bow Dep., Ex. 55.   Some of those contracts are with unaffiliated third parties, for example with the original equipment manufacturer, Vestas, who brings the expertise necessary to operate and maintain the turbines themselves. Second Hickok Dec., ¶¶ 39-40, Ex. 19, ¶¶ 45-46, Ex. 22.   Numerous other tasks, like crane rental, grounds maintenance, propane service, janitorial service, road grading, and the like, are similarly solicited from and performed by independent vendors who possess the proper equipment and knowledge to competently accomplish the work. Second Hickok Dec., Exs. 7, 9, 11, 13.   Other contracts are with upstream affiliates of the Project Entity, who supply administrative support services, like legal, accounting, or human resources assistance both to these Project Entities and to the many other wind facilities in the portfolio of indirect ownership. *Id.*   Whether the delegation of performance has been to affiliated or unaffiliated third parties, the Project Entities remain responsible to NPPD for the outcome. PPAs, § 5.2.1.

Finally, NPPD will contend, and indeed has always known, that the Project Entities themselves do not have any employees. Second Hickok Dec., ¶28.   That is by design, as it would be highly inefficient for each Project Entity to itself separately employ hundreds of personnel, including not only managers, but maintenance and repair crews, crane operators, janitors, road maintenance crews, and the like.   Instead, the Project

Entities, acting as limited liability companies through their manager and officers, have delegated by contract to others the performance of the various tasks required under the PPAs, as permitted under the express terms of the PPAs and basic concepts of contract law, while retaining liability to NPPD for the outcome of those efforts if not in compliance with PPA requirements.   Nothing in the PPA's or the common law prohibits that structure and method of operation.

### 3.      The PPAs did not involve a non-delegable, personal duty

The second exception to the general rule permitting delegation of contractual duties is when there is some unique, personal attribute regarding that the task itself or regarding the contracting party that renders performance non-delegable.  This concept is often discussed in the setting of contracts for personal services that require specialized skill or judgment, like an opera singer, painter, author, or football player. Performance under such contracts is deemed personal to the contracting parties, because in the words of the Restatement, the "obligee has a substantial interest in having that person perform or control the acts promised."   Restatement (Second) of Contracts, § 318(2).   *See e.g Andersen v. Ganz,* 6 Neb. App. 224, 229, 572 N.W.2d 414, 418 (1997) (discussing Nebraska law regarding assignability of a personal services contract).

Whether a particular contract is in that category is driven by whether the acts to be performed "are of such character that performance by an agent will be substantially the same thing as performance by the obligor himself."  3 Williston, Contracts, § 411 at 20 (year).   In other words, "[t]he fact that a contract calls for the performance of labor or service is not sufficient to render it non-assignable, if, from consideration of the entire

contract, it appears that personality is not an essential consideration, and only a certain object or result is contracted for and not the personal labor or services of the promisor." *In re Fastrax, Inc.,* 129 B.R. 274, 278 (Bankr. M.D. Fla. 1991).  As such, courts have rejected claims that contracts were non-delegable on tasks such as the creation of computer software, the construction of automation systems, or the distribution of parts and supplies.  *See Fastrax,* 129 B.R. at 278; *R&B Appliance Parts, Inc. v. Amana Co.,* 258 F.3d 783, 786 (8th Cir. 2001); *Isra Vision, AG v. Burton Industries, Inc.,* 654 F.Supp. 638, 649 (E.D. Mich. 2009).

The PPAs do not involve personal services.  NPPD contracted for an outcome—electricity from a well-run wind facility—a subject matter not dependent upon a particular person or entity-owner performing all facets of the many, varied and obviously complex tasks necessary to make that outcome happen. PPAs, § 5.2.1.  Performance by parties other than the Project Entities, parties with the differing sets of expertise and skills necessary to operate a well-run wind facility, would give NPPD the exact same outcome without deviation from what it contracted to receive under the PPAs.  NPPD had no "substantial interest" in having any particular person complete the work, only in the outcome of that work, and thus the Project Entities were not precluded from delegating to others the tasks needed to accomplish that end product.

NPPD's pleadings quote extensively from a Management Services Agreement between upstream affiliates of the Project Entities that has no relevance whatsoever. Amended Complaint, ¶¶ 41-50; Amended Counterclaim, ¶¶ 76-84.  That agreement, between NRG Yield, Inc. and NRG Energy, Inc., through which various administrative services were provided between them, did not involve project level services, and no

Project Entity was a party to the contract. Laredo Dep., 8:8-23.  Even if project level services were involved, delegation of those duties to an affiliated third party is permitted by the PPAs and applicable law.

Accordingly, NPPD's second theory of breach fails for the same reason as its first.  The clear and unambiguous provisions of the PPA allow the activities about which NPPD complains, and its claims are therefore without merit as a matter of law.

## D.    NPPD WAIVED ITS CLAIMS BY ACCEPTING PERFORMANCE

Alternatively, and if the Court declines to dismiss NPPD's claims under the terms of the PPAs, NPPD has waived any right it might have had to claim that the purported changes of control, or any change in the delegation of performance of contractual duties that accompanied them, constitutes a default under the PPAs.  By continuing to receive and pay for the electricity produced by the wind facilities for years without objection notwithstanding its contemporary knowledge of the transactions, thus accepting the benefits of the PPAs, NPPD waived any claim for breach.

"A waiver is a voluntary and intentional relinquishment of a known right, privilege, or claim, and may be demonstrated by or inferred from a person's conduct."  *State ex rel. Wagner v. Amwest Sur. Ins. Co.*, 280 Neb. 729, 736–37, 790 N.W.2d 866, 872 (2010); *See State Bank, Palmer v. Scoular-Bishop Grain Co.*, 217 Neb. 379, 389, 349 N.W.2d 912, 918 (1984) (affirming "the course of dealing between the [parties] was a waiver" of Plaintiff's rights).  Continued performance of contract obligations, and the corresponding acceptance of ongoing contractual benefits with knowledge of a breach, constitutes a waiver of that breach.  "Ordinarily, the acceptance of performance after a default in performance waives the right to rely upon the default."  *City of Gering v.*

37

*Smith,* 215 Neb. 174, 179, 337 N.W.2d 747, 750 (1983), *quoting Peckham v. Deans,* 186 Neb. 190, 192, 181 N.W.2d 851, 853 (1970).  *See Pearce v. ELIC Corp.,* 213 Neb. 193, 201, 329 N.W.2d 74, 79 (1982) ("The general rule is that the assertion of the invalidity of a contract is nullified by the subsequent acceptance of benefits growing out of the contract claimed to have been breached").

NPPD had knowledge of the 2014 NRG Acquisition prior to its closing, and for almost five years prior to its issuance of notices of default to the Project Entities.  It participated in project refinancing transactions during that time, accepting replacement letters of credit.  NPPD continued to purchase the full output of the Projects, without objection or any indication of concern, from 2014 through the date of the default notices in January of 2019.  In fact, NPPD has performed for more years, collectively among the four Project Entities, with new upstream owners in place than it did while Edison Mission affiliates, the original upstream owner, held those interests. *Compare*, Laredo Dep., Ex. 25; Elkhorn Dep., Ex. 39; Crofton Dep., Ex. 49; Broken Bow Dep., Ex. 54., *with,* Laredo PPA, Elkhorn PPA, Crofton PPA, and Broken Bow PPA. Thus, by its conduct and continued acceptance of contractual benefits, NPPD has waived any claim that the 2014 NRG acquisition was in breach of Section 10.2.

Likewise, after learning of the GIP Acquisition more than six months before it closed, rather than making a timely objection to allow the parties to address any issue, NPPD waited until five months after closing before issuing the notices of default. *Compare*, First Hickok Dec., ¶30, Ex. 18 (providing notice of the pending GIP Acquisition on February 8, 2018), *with,* Laredo Dep., 24:2-4, Ex. 25; Elkhorn Dep., 15:24-16:2, Ex. 39; Crofton Dep., 12:12-25, Ex. 49; Broken Bow Dep., Ex. 54 (GIP

Acquisition closing on August 31, 2018), *with,* First Hickok Dec., ¶¶ 24-26, Exs. 12-14 (NPPD's January 11, 2019 Notices of Event of Default).    NPPD cannot fairly allow the transaction to close without objection, accept the benefits of the contract for months, and then assert after-the-fact complaints.   As with the NRG Acquisition, NPPD's undisputed conduct and course of dealing regarding the GIP Acquisition waived any claim under Section 10.2.1.

**E.    THE PROJECT ENTITIES ARE ENTITLED TO A PERMANENT INJUNCTION**

The Project Entities seek both declaratory relief regarding NPPD's right to terminate the PPAs, and a permanent injunction prohibiting them from doing so in reliance upon the issues raised.  The elements for entry of a permanent injunction are similar to those for a preliminary injunction, except for actual success on the merits rather than a likelihood of success.   They are: 1) actual success on the merits; 2) irreparable harm to the movant; 3) that the harm outweighs any possible harm to others; and 4) that an injunction serves the public interest.   *Community of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church,* 634 f.3d 1005, 1012 (8th Cir. 2011).  *See Bank One, Utah v. Guttau,* 190 F.3d 844, 847 (8th Cir. 1999).  The Project Entities' entitlement to success on the merits is discussed above; the remaining elements are discussed below.

**1.    The Project Entities would suffer irreparable harm from NPPD's wrongful termination of the PPAs**

The Project Entities will suffer irreparable harm if NPPD is not permanently restrained from terminating the PPAs.  NPPD's planned termination of the PPAs would result in irreparable harm for four primary reasons: (1) termination will result in the Project Entities' default of their credit agreements with lenders, who will possess

remedies that could prompt the need for bankruptcy; (2) loss of PPA contract pricing risks financial failure of the Projects and loss of each facility as a going concern; (3) NPPD would gain the right to assert eminent domain at post-termination fair market value; and (4) the PPAs specifically contemplate that a dispute over transactions subject to Section 10.3 will result in irreparable harm for which either party would have the right to seek injunctive relief. First Hickok Dec., ¶31; Second Hickok Dec., ¶14; PPAs, §§ 10.1, 10.3.

First, if NPPD terminates the PPAs, the Projects will be in default under credit agreements with their respective lenders, creating a material risk of potential bankruptcy to avoid the immediate adverse impact of creditor remedies. First Hickok Dec., ¶31; Second Hickok Dec., ¶14. The credit agreements each define the PPA as a "Material Project Document" that if breached or if otherwise ceasing to be in full force and effect would constitute an event of default by the borrower. First Hickok Dec., Ex. 15 at 99-101, Ex. 16 at 95-96; and Ex. 17 at 95-96; Second Hickok Dec., Ex. 15 at 103-105. Upon the occurrence of an event of default, the lenders acquire a variety of remedies, including the right to accelerate debt and foreclose security interests in Project assets or ownership interests. First Hickok Dec., Ex. 15 at 103-104, Ex. 16 at 99-100, Ex. 17 at 98-100; Second Hickok Dec., Ex. 15 at 105. Bankruptcy and project failure would be likely if those creditor remedies were exercised. First Hickok Dec., ¶31; Second Hickok Dec., ¶14. In *Doran v. Salem Inn, Inc.*, the Supreme Court stated, "[c]ertainly the [risk of bankruptcy] sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless." 422 U.S. 922, 932 (1975).

Second, the Project Entities would be irreparably harmed because NPPD's

termination of the PPAs would effectively end the value of each Project as a viable going concern. First Hickok Dec., ¶31; Second Hickok Dec., ¶14.  Loss of each Project's revenue stream at the contract pricing guaranteed in the PPA would remove the primary economic driver for Project stability and success.  Without a long-term PPA, a wind energy project is not sustainable.  First Hickok Dec., ¶11.

"The term 'going concern,' when applied to a corporation, means that it continues to transact its ordinary business." *State ex rel. Sorensen v. Lincoln Hail Ins. Co.*, 133 Neb. 496, 276 N.W. 169, 174 (1937); *Wilson v. Nebraska State Bank*, 126 Neb. 168, 252 N.W. 921, 923 (1934).  "Black's Law Dictionary defines 'going concern' as '[a] commercial enterprise actively engaging in business with the expectation of indefinite continuance.'" *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 828 (8th Cir. 2016) (citing *Going Concern*, Black's Law Dictionary (10th ed. 2014)).  With respect to the need for injunctive relief, "proof that a going concern will be forced out of business during the pendency of litigation raises a presumption of irreparable harm." *United States v. Any & All Assets of That Certain Bus. Known As Shane Co.*, 816 F. Supp. 389, 400 (M.D.N.C. 1991).  *See Arkansas Hospice, Inc. v. Sebelius*, 1 F. Supp. 3d 915, 926 (E.D. Ark. 2014) (citation omitted) (stating "the potential for irreparable harm is present 'when the potential economic loss is so great as to threaten the existence of the moving party's business.'"); *Paschall v. Kansas City Star Co.*, 441 F.Supp. 349 (W.D. Mo. 1977)) (stating, "Irreparable injury has been characterized as loss of a movant's enterprise.").  Whether because of bankruptcy, or by the adverse economic consequences of the loss of its expected revenue stream, injunctive relief is necessary to protect the going concern value of each Project Entity in this case.

Next, termination would result in NPPD immediately gaining the ability to exercise its statutory right to acquire the Project Entities' assets by eminent domain. PPAs, § 10.1.  NPPD's contractual waiver of that right expires upon termination of the PPA for an event of default by the Project Entities.  *Id.*  NPPD's right would not only adversely impact the Project Entities' property interests, but unfairly and immeasurably reduce the fair market value of the Projects that NPPD must pay were it to condemn the facilities.

In Nebraska, injunctive relief is the proper remedy to challenge the exercise of eminent domain.  *Monarch Chem. Works, Inc. v. City of Omaha*, 203 Neb. 33, 35-36, 277 N.W.2d 423, 425 (1979) (citation omitted) ("We therefore amplify the rule to read that injunction is a proper form of remedy in which to present the question of unlawful or improper exercise of the power of eminent domain, and proof of the attempt to so deprive a private citizen of an estate in his property makes the resulting damage irreparable and the legal remedy inadequate.").  More fundamentally, "monetary relief fails to provide adequate compensation for an interest in real property, which by its very nature is considered unique." *O'Hagan v. United States*, 86 F.3d 776, 783 (8th Cir. 1996) (citations omitted); *see O'Connor v. Kaufman*, 260 Neb. 219, 230, 616 N.W.2d 301, 310 (2000).

The same concept should hold true to protect the Project Entities against a governmental body wrongfully acquiring a right it did not previously possess to condemn their property.  The potential loss of such unique property rights cannot be cured by damages.  Moreover, in this instance, termination of the PPAs and its above-market pricing would vest NPPD with the right to force a later sale at then-existing fair market

value, an amount that will be dramatically reduced by the termination itself.  Such a sale would stand in stark contrast to the more limited purchase opportunity negotiated in the PPAs, addressing when and how NPPD could acquire the Projects.  The loss of those rights, in the context of a potential post-termination condemnation, constitutes irreparable harm.

Finally, in Section 10.3 of the PPAs, NPPD specifically agreed that a "failure or threatened failure to comply with the terms of this Section 10 may cause irreparable injury" and each party "shall have the right to obtain from any  competent court a decree enjoining such breach or threatened breach of this Section 10."  PPAs, § 10.3.  NPPD should be compelled to honor the terms of the contract it executed, including its intention that injunctive relief is now proper and necessary.

### 2.    The balance of harm favors the Project Entities

In comparison, NPPD faces little, if any, harm from an order restraining it from terminating the PPAs.  Upon executing the contracts, NPPD expected that it would be purchasing all the output of the Projects for 20 years at predetermined prices.  PPAs, §§ 3.1, 5.3.1.  To be compelled to continue to do so, as would have been the case in the absence of the alleged breach, subjects NPPD to nothing more than it should have planned for already.  Certainly, in comparison to the dramatic consequences the Project Entities will face if the PPAs are terminated, the harm to NPPD is minor.  Requiring that NPPD maintain its commitment to the PPAs it signed with the Project Entities in the absence of breach reflects the proper balancing of interests in this situation.

### 3.    The Public Interest Favors Enforcement of the PPAs.

The public interest weighs in favor of the issuance of injunctive relief for two

43

primary reasons: (1) the potential failure of multiple wind energy projects in Nebraska would harm both the general public interest in the successful development of renewable energy projects, and the specific economic interest of the local communities in the Projects themselves, and (2) termination would be inconsistent with the public interest in the government honoring its contractual obligations.

"That the generation of clean, renewable energy is of substantial importance to the public interest is beyond dispute." *Backcountry Against Dumps v. Perry*, No. 3:12-CV-03062-L-JLB, 2017 WL 3712487, at *5 (S.D. Cal. Aug. 29, 2017) (citations omitted). The importance of renewable energy has triggered "[s]tates [to] adopt[] a number of policies to support greater investment in and adoption of renewable energy technologies." *Energy Resources for State and Local Governments,* UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, https://www.epa.gov/statelocalenergy/state-renewable-energy-resources. For example, the Nebraska legislature declared:

> The Legislature hereby finds and declares that the use of solar energy and wind energy in Nebraska … is of such importance to the public health, safety, and welfare that the state should take appropriate action to encourage its use.

Neb. Rev. Stat. § 66-901.

To that end, Nebraska has implemented incentive programs to encourage the development of wind energy projects, including for example the community-based energy development program (" C-BED"), referenced in the PPAs.  *See* PPAs, § 10.2.3. The C-BED law exempts the component parts of a wind energy generation facility from state sales tax if, during the life of the project, at least twenty-five percent of the gross power purchase agreement payments flow to a Nebraska community or a qualified owner, which may be an individual or a Nebraska business entity.  Neb. Rev. Stat. § 17-

1901 *et seq.*  In fact, the Elkhorn project's Nebraska member is involved so that C-BED benefits can be obtained.  Programs such as C-BED confirm the existence of a strong public interest in the success of wind energy development.

NPPD must agree, having boasted in a 2015 press release that "nearly 60 percent of the energy provided to Nebraska electric customers from NPPD is carbon-free, which significantly betters both regional and state averages." NEBRASKA PUBLIC POWER DISTRICT (Dec. 31, 2015), https://www.nppd.com/press-releases/customers-sign-new-nppd-power-supply-contract.  NPPD's website further proclaims that its mission is consistent with such a public interest:   "Keeping with our mission of providing sustainable energy, our carbon-free energy generation resource mix is the best in the nation." NEBRASKA PUBLIC POWER DISTRICT, https://www.nppd.com/powering-nebraska/energy-resources (last accessed Dec. 19, 2019).  The failure of these Projects from NPPD's wrongful termination of the PPAs would stand in stark and obvious contrast to this strong public interest.  Moreover, the four Nebraska communities that enjoy substantial economic benefits from successfully operating local wind projects stand to lose much if NPPD succeeds in its termination plans.  Land owners who receive lease payments for wind turbine facilities on their property, local tradesman who work to help maintain facility equipment and infrastructure, even local restaurants that sell meals to those who visit the community on behalf of the Project Entities will all suffer if the PPAs are terminated.

Finally, as a more general matter, the proper enforcement of contracts with governmental bodies is in the public interest.  Nebraska has a vested interest in maintaining the integrity of contractual agreements entered into under the laws of its

state.  *See, e.g., Prof'l Firefighters Ass'n of Omaha, Local 385 v. City of Omaha*, No. 8:10CV198, 2010 WL 2426446, at *5 (D. Neb. June 10, 2010) (stating, "It is in the public interest to uphold contracts made between the citizens of Nebraska and its public officials.").  It is thus in the public interest to enforce the obligations of the PPAs executed between NPPD and the Project Entities according to their terms.

## CONCLUSION

Neither the transactions involving upstream affiliates nor the delegation of performance of contractual duties was a breach of the PPAs.  Accordingly, the Project Entities are entitled to judgment as a matter of law on all claims, counterclaims and third-party claims raised in this action, and NPPD should be permanently enjoined from terminating the PPAs in reliance upon the alleged events of default which are the subject of this action.

Dated this 19th day of December, 2019.

LAREDO RIDGE WIND, LLC; BROKEN BOW WIND, LLC, and CROFTON BLUFFS WIND, LLC, Plaintiffs, and ELKHORN RIDGE WIND, LLC, Third-Party Defendant,

By:   /s/Steven D. Davidson
Steven D. Davidson (#18684)
Spencer R. Murphy (#26081)
of:   BAIRD HOLM LLP
1500 Woodmen Tower
1700 Farnam Street
Omaha, Nebraska 68102
Email: sdavidson@bairdholm.com
smurphy@bairdholm.com
Telephone:   (402) 344-0500

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with NECivR 7.1(d)(3) and further certify that the word count function was applied to include all text, including the caption, headings, footnotes, and quotations.  This document was prepared using Microsoft Word 2013 and contains 12,970 words.

/s/Steven D. Davidson

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of December, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

wlamson@ldmlaw.com
mstorey@ldmlaw.com

/s/Steven D. Davidson

DOCS/2382888.5