# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LAREDO RIDGE WIND, LLC, BROKEN BOW WIND, LLC, and CROFTON BLUFFS WIND, LLC, | 8:19CV45 |
| Plaintiffs and Counterclaim Defendants, | MEMORANDUM AND ORDER |
| vs. | |
| NEBRASKA PUBLIC POWER DISTRICT, | |
| Defendant, Counter Claimant, and Third-Party Plaintiff, | |
| vs. | |
| ELKHORN RIDGE WIND, L.L.C., a Delaware Limited Liability Company, | |
| Third-Party Defendant. | |

This matter is before the Court on the Motion for Summary Judgment, ECF No. 68, filed by Plaintiffs and Counterclaim Defendants Laredo Ridge Wind, LLC (Laredo), Broken Bow Wind, LLC (Broken Bow), and Crofton Bluffs Wind, LLC (Crofton), and by Third-Party Defendant Elkhorn Ridge Wind, L.L.C. (Elkhorn) (collectively "Project Entities"). For the following reasons, the Motion will be granted.

## BACKGROUND

The parties, in their briefs, provided numbered paragraphs of facts with pinpoint citations to admissible evidence in the record, in compliance with NECivR 56.1[1] and

---

[1] *See* NECivR 56.1(b)(1):

Federal Rule of Civil Procedure 56. Unless otherwise stated, the following facts are those that appear uncontested.

This dispute arises from Power Purchase Agreements (PPAs) between the Nebraska Public Power District (NPPD) and the owners of several wind energy projects.

## I. Parties

Laredo is a limited liability company organized under the laws of Delaware whose sole member is Mission Wind Laredo, LLC. There are several tiers of ownership above Laredo. The nearest ownership entities that are not limited liability companies are Clearway Energy, Inc., a Delaware corporation with its principal place of business in Princeton, New Jersey, and GIP III Zephyr Acquisition Partners, LLP, a limited liability partnership with no general or limited partners who are residents or citizens of Nebraska. No ownership entity upstream of Laredo is a resident or citizen of Nebraska.

Broken Bow is a limited liability company organized under the laws of Delaware whose sole member is Mission Wind Broken Bow, LLC. There are several tiers of ownership above Broken Bow. The nearest ownership entity that is not a limited liability company is Capistrano Wind Holdings, Inc. (Capistrano), a Delaware corporation with its principal place of business in California. No ownership interest upstream of Broken Bow is a resident or citizen of Nebraska.

---

The party opposing a summary judgment motion should include in its brief a concise response to the moving party's statement of material facts. Each material fact in the response must be set forth in a separate numbered paragraph, must include pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other material upon which the opposing party relies, and, if applicable, must state the number of the paragraph in the movant's statement of material facts that is disputed. <u>Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.</u>

Crofton is a limited liability company organized under the laws of Delaware whose sole member is Mission Wind Crofton Bluffs, LLC. There are several tiers of ownership above Crofton. The nearest ownership entity that is not a limited liability company is Capistrano. No ownership interest upstream of Crofton is a resident or citizen of Nebraska.

Elkhorn is a limited liability company organized under the laws of Delaware whose members are Elkhorn Holdings, LLC, and Tenaska Elkhorn Ridge I, LLC (Tenaska). Tenaska has members that are citizens of Nebraska.

NPPD is a Nebraska political subdivision and public power district. It is Nebraska's largest electric utility.

## II. Power Purchase Agreements

Elkhorn and NPPD entered into a PPA on February 27, 2008. Crofton and NPPD entered into a second restated and amended PPA on April 23, 2008. Laredo and NPPD entered into a PPA on February 5, 2010. Broken Bow and NPPD entered into a PPA on September 22, 2010.

The PPAs provided that NPPD would purchase all energy produced by each project for a period of twenty years at a predetermined price that would gradually increase each year. Execution of a PPA is a standard aspect of wind energy project development, enabling the Project Entities to secure financing and other prerequisites. The PPAs are materially identical to one another.

Section 10.2 of the PPAs states the following:

10.2.1 Seller [the Project Entity] shall not: (a) consolidate or merge with any other Person, or reorganize, consolidate, Change Control or change the form of Seller's business organization from a limited liability company; or, (b) sell, transfer, lease, transfer by operation of Law, or otherwise dispose

3

of the Site or Plant or any unit thereof or all or substantially all of Seller's assets[,] . . . or (c) assign this Agreement, or any of its rights or obligations under this Agreement (each, a "Transaction") to any Person (the "Transferee"), whether in a single transaction or a series of transactions, unless such Transaction is expressly approved in writing by NPPD . . . and any Transaction in the absence of such required approval shall be void and of no legal effect.

* * *

10.2.3 "Change Control" means the sale or transfer after the Effective Date of a majority of the direct ownership interests in Sellers but excludes transfers to Affiliates of Edison Mission Energy, the enforcement of liens on such ownership interests (and sales or transfers by Seller Lenders) permitted by Section 20.11, transfers to establish or maintain qualification as a C-BED Project, transfers of ownership interests among the owners of Seller and transfers due to the death of individual owners. Affiliates of Edison Mission Energy shall mean any other Person that controls, is under the control of, or is under common control with, Edison Mission Energy. The term "control" (including the terms "controls", "under the control of" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management of the policies of a Person, whether through ownership interest, by contract or otherwise.

Br. in Supp., ECF No. 69 at Page ID 842–43.

Section 4.2 of the PPAs states:

Subject to NPPD's rights under this Agreement, Seller intends to construct, solely own, finance,[2] operate and maintain the Plant and Site in a manner which will at all times meet the requirements of this Agreement. Without limiting the generality of the foregoing, Seller shall provide NPPD each business day after the connection to NPPD Interconnection Facilities the operating conditions and scheduled maintenance of the Plant and coordinate in accordance with Prudent Utility Practice scheduled maintenance to minimize any problem such maintenance may impose on the electric transmission system operations of NPPD. In all events, Seller agrees that it will use Commercially Reasonable Efforts in the construction, operation and maintenance of the Plant.

Br. in Supp., ECF No. 69 at Page ID 844.

## III. Edison Mission Energy Bankruptcy and Subsequent Transactions

---

[2] The PPA between Elkhorn and NPPD does not include the word finance.

4

The original ultimate parent company of the Project Entities, Edison Mission Energy (EME), filed for bankruptcy in 2012. In April 2014, affiliates of NRG Energy, Inc. (NRG) acquired interests in parent companies and upstream affiliates of the Project Entities in a transaction approved by the bankruptcy court. NRG did not acquire membership interests in any of the Project Entities.

In August 2018, an affiliate of GIP III Zephyr Acquisition Partners, LLP (GIP), acquired interests in parent companies of the Project Entities from NRG. The upstream affiliate of all four Project Entities, Zephyr Renewables, LLC, was acquired by GIP and renamed Clearway Energy Group LLC (Clearway). GIP did not acquire membership interests in any of the Project Entities.

NPPD was aware of NRG's proposed acquisition of EME's renewable assets. NPPD and the Project Entities executed documents in connection with the exchange of letters of credit after the NRG acquisition.

## IV. Project Servicing and Operating and Maintenance Contracts

The Project Entities have officers, but they do not have employees. In order to meet their obligations under the PPAs, the Project Entities entered into several agreements with outside entities. Laredo, Broken Bow, and Crofton entered into agreements (Services Agreements) with Clearway Asset Services to provide support services, administrative services, and additional services. Elkhorn entered into a Services Agreement with Elkhorn Holdings LLC. Under the Services Agreements, the Project Entities would receive:

> a) Support Services, meaning work related to planned or actual construction projects including assistance with oversight of engineering, design, procurement, construction, and similar services . . . as may be necessary in pursuing the [Project Entity's] construction projects; b) Administrative

5

> Services, meaning centralized management and administration services, including management, legal, payroll, human resources, accounting, government affairs, tax and other professional services, procurement and administration of an appropriate insurance program, environmental, general procurement and any other similar activity necessary or desirable for [the Project Entity] or its business; c) letter of credit services, and d) any additional services specifically requested.

Br. in Supp., ECF No. 69 at Page ID 849.

The Project Entities entered into agreements for the operation and maintenance of the facilities (O&M Agreements) with Clearway Renewable Operation & Maintenance LLC. These agreements provided for the performance of "various functions relating to the wind turbines, including all operational responsibility, all routine maintenance and repair, procurement of parts and supplies, preparation of operating logs, program and procedures, management of warranties, budgeting, outages, waste, leases monitoring, and a wide range of other functions." Br. in Supp., ECF No. 69 at Page ID 850.

Crofton and Elkhorn also entered into agreements (Vestas Agreements) with Vestas-American Wind Technology, Inc. (Vestas). Under the Vestas Agreements, Vestas agreed to provide "maintenance, diagnostics, repair and replacement services in connection with the turbines." Br. in Supp., ECF No. 69 at Page ID 851.

## V. Procedural History

In January 2019, NPPD sent written notice of default to the Project Entities, stating that they were in violation of the PPAs and that NPPD intended to terminate the PPAs. On January 30, 2019, Laredo, Broken Bow, and Crofton brought this action against NPPD for declaratory judgment and injunctive relief and moved for a temporary restraining order preventing NPPD from terminating the PPAs. Compl., ECF No. 1; Mot. for TRO, ECF No. 6. On February 1, 2019, NPPD stipulated to a temporary restraining order, ECF No. 16, and on February 15, 2019, stipulated to a preliminary injunction, ECF No. 25, prohibiting

6

NPPD from terminating the PPAs pending the disposition of this action. In its Answer, filed on February 11, 2019, NPPD asserted several counterclaims against Laredo, Broken Bow, and Crofton, as well as third party claims against Elkhorn, alleging that the Project Entities were in default and NPPD had the right to terminate the PPAs. Elkhorn answered NPPD's third-party complaint and asserted counterclaims against NPPD. ECF No. 29. On December 19, 2019, the Project Entities filed the instant Motion for Summary Judgment, ECF No. 68.

## STANDARD OF REVIEW

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 884 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(c)). "Summary judgment is not disfavored and is designed for every action." *Briscoe v. Cty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc)). In reviewing a motion for summary judgment, the Court will view "the record in the light most favorable to the nonmoving party . . . drawing all reasonable inferences in that party's favor." *Whitney v. Guys, Inc.*, 826 F.3d 1074, 1076 (8th Cir. 2016) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)). Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 618 (8th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The moving party

7

need not produce evidence showing "the absence of a genuine issue of material fact." *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 517 (8th Cir. 2015) (quoting *Celotex*, 477 U.S. at 325). Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325).

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts and must come forward with specific facts showing that there is a genuine issue for trial." *Wagner v. Gallup, Inc.*, 788 F.3d 877, 882 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1042). "[T]here must be more than the mere existence of some alleged factual dispute" between the parties in order to overcome summary judgment. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Vacca v. Viacom Broad. of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Wagner*, 788 F.3d at 882 (quoting *Torgerson*, 643 F.3d at 1042). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue of material fact" for trial

and summary judgment is appropriate. *Whitney*, 826 F.3d at 1076 (quoting *Grage v. N. States Power Co.-Minn.*, 813 F.3d 1051, 1052 (8th Cir. 2015)).

## DISCUSSION

The Project Entities move for summary judgment, arguing there was no default; therefore, NPPD should be permanently enjoined from terminating the PPAs. NPPD argues the Project Entities defaulted on the PPAs by improperly transferring ownership of the Project Entities and by improperly delegating duties under the PPAs.

**I.      Permanent Injunction**

"The standard for issuing a preliminary or permanent injunction is essentially the same, excepting one key difference. A permanent injunction requires the moving party to show actual success on the merits . . . ." *Oglala Sioux Tribe v. C & W Enters., Inc.*, 542 F.3d 224, 229 (8th Cir. 2008) (citing *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 733 (8th Cir. 2008) (en banc); *Randolph v. Rogers*, 170 F.3d 850, 857 (8th Cir. 1999)). In addition to actual success on the merits, the Court must "consider[] the following factors in deciding whether to grant a permanent injunction: (1) the threat of irreparable harm to the moving party; (2) the balance of harms with any injury an injunction might inflict on other parties; and (3) the public interest." *Id.* (citing *Planned Parenthood*, 530 F.3d at 729 n.3; *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)).

*A. Success on the Merits*

To answer the threshold question of success on the merits, the Court must determine whether the Project Entities have shown, under Nebraska law, that they did not default on the PPAs. In Nebraska, "a court faced with a question of contract

9

interpretation must first determine whether the contract is ambiguous." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 498 (8th Cir. 2013) (citing *Bedrosky v. Hiner*, 430 N.W.2d 535, 539 (Neb. 1988)). A contract is unambiguous if it "'is not subject to interpretation or construction,' and a court simply must give effect to that language." *Id.* (quoting *Bedrosky*, 430 N.W.2d at 540). However, "[a] provision of a contract is ambiguous when, considered with other pertinent provisions as a whole, it is capable of being understood in more senses than one." *Id.* (quoting *Bedrosky*, 430 N.W.2d at 539). If a "contract is ambiguous, the meaning of its terms is a matter of fact to be determined in the same manner as other questions of fact." *Id.* (quoting *Bedrosky*, 430 N.W.2d at 540).

1. Transfer of Ownership

The parties dispute what is prohibited by the Change Control clause, which prohibits the sale or transfer of "a majority of the direct ownership interests in [the Project Entities] . . . ." Br. in Supp., ECF No. 69 at Page ID 854. The Project Entities argue that the clause is unambiguous and that the NRG and GIP acquisitions did not constitute sales of direct ownership interests. NPPD agrees the clause is unambiguous, yet NPPD suggests the *contract* as a whole is ambiguous, and NPPD focuses on operational control rather than formal membership interests in the Project Entities.

"Control and ownership . . . are distinct concepts." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 477 (2003). It is "[a] basic tenet of American corporate law . . . that the corporation and its shareholders are distinct entities." *Id.* at 474 (citing *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 625 (1983)).

Although the PPAs do not refer to "membership" interests, they do limit prohibited transactions to those of "direct ownership interests." Br. in Supp., ECF No. 69 at Page

10

ID 854. Courts have often held that "direct" ownership refers to shares or membership in the entity itself, not upstream interests. For example, in *Dole Food*, the Supreme Court determined that for a corporation to be an instrumentality of a foreign state for purposes of the Foreign Sovereign Immunity Act (FSIA), 28 U.S.C. § 1630(b), "only direct ownership of a majority of shares by the foreign state satisfies the statutory requirement." *Dole Food*, 538 U.S. at 474. The Court held that the Dead Sea Companies were not instrumentalities of Israel, because Israel only owned a majority of shares of companies one or more corporate tiers above the Dead Sea Companies—even though Israel "exercised considerable control over their operations." *Id.* at 477.

Similarly, in *Fox v. Portico Realty Services Office*, 739 F. Supp. 2d 912 (E.D. Va. 2010), the court considered the statutory exception to Title VII liability for Alaska Native Corporations. Relying on the Supreme Court's holding in *Dole Food*, the court determined, that the exception applied only "where the Native Corporation directly owns the subsidiary." *Id.* at 917. The Native Corporation, NANA Regional Corporation owned NANA Development Corporation, which in turn owned Qivliq LLC, which in turn owned Portico Realty Services. *Id.* In other words, "NANA Regional Corporation can only be said to own Portico *indirectly*." *Id.* (emphasis in original).

NPPD argues that the phrase "direct ownership interests" is open to multiple meanings and the word "direct" was only included to ensure the interests transferred were important to the Project Entities and NPPD. In support, NPPD cites to Black's Law Dictionary and several cases.

Black's Law Dictionary defines "direct" as: "1. (Of a thing) straight; undeviating . . . . 2. (Of a thing or a person) straightforward . . . . 3. Free from extraneous influence;

immediate . . . . 4. Of, relating to, or involving passing in a straight line of descent, as distinguished from a collateral line . . . ." *Direct*, Black's Law Dictionary (11th ed. 2019). Under these definitions, NPPD argues, direct could embrace either ownership of the membership interests in the Project Entities or ownership in a straight line from the parent entities to the Project Entities.

NPPD also cites to *Illinois National Insurance Co. v. CPRT Investment Corp.*, No. 1:07-cv-00007-RAW, 2008 WL 5470956 (S.D. Iowa Nov. 7, 2008). In *Illinois National*, the court determined that the term "direct expenses of a flight" was ambiguous. *Id.* at *6. The court relied upon the definitions of direct in Webster's Third New International Dictionary (Webster's International). Webster's International defines "direct" as "stemming immediately from a source[,]" "capable of being allocated to a particular portion or process of an undertaking and so treated in cost accounts; *specif.:* chargeable to a particular job—compare DIRECT COST . . . [,]" and "characterized by or giving evidence of a close esp. logical, causal, or consequential relationship." Relying on these definitions, the court found that "direct expenses of a flight" could be interpreted as meaning "(1) expenses stemming directly from a flight or (2) expenses bearing a close relationship and capable of being allocated to a flight." *Ill. Nat'l*, 2008 WL 5470956, at *6.

NPPD also argues that "ownership interests" implies more than legal title. This is because a) "interests" is plural and b) the parties used "ownership" rather than "membership." In support of this argument, NPPD cites to the Merriam Webster Online Dictionary 2020 (Webster Online). Webster Online defines interest as "right, title, or legal share of something" or "participation in advantage and responsibility." Webster Online defines ownership as "the state, relation, or being of being an owner." Br. in Opp'n, ECF

No. 94 at Page ID 2523. Because the parties used the term "interests" and did not specify "membership" interest, NPPD argues that all possible definitions should be included. Yet this ignores the limitation of "direct." Direct ownership interests cannot be interpreted to mean anything other than ownership of the Project Entities themselves, not majority ownership of upstream corporate entities. To extend the definition of ownership interests to include "control" would encompass indirect ownership interests. Also, "control" is a defined term in the PPAs, and the Court infers that the parties would have used the word "control" rather than "direct ownership interest" if they intended to do so. The Project Entities did not transfer a majority of the direct ownership interests in the Project Entities and therefore did not default on the PPAs by violating the Change Control clause. Therefore, the Project Entities are entitled to summary judgment on this issue.

2. Delegation of Duties

The Project Entities argue that NPPD failed to plead that they wrongfully delegated duties under the PPAs in violation of section 10.2.1 and instead pled that they violated section 4.2. To plead a breach of contract, a plaintiff must plead facts showing "the existence of a promise, its breach, damage, and compliance with the conditions precedent which activate the defendant's duty." *Estate of Peterson v. Boland*, No. 8:16CV183, 2016 WL 6102339, at *4 (D. Neb. Oct. 19, 2016) (quoting *Dep't of Banking & Fin. of Neb. v. Wilken*, 352 N.W.2d 145, 147 (Neb. 1984)). Although NPPD did not allege that the Project Entities violated section 10.2.1 specifically, it alleged that the Project Entities wrongfully "abdicated their responsibilities and turned over the day-to-day operations and management to a third party with whom NPPD has no contractual

agreement." This is sufficient to put the Project Entities on notice that NPPD was alleging that they improperly delegated their duties under the PPAs.

As a general rule, "[a]n obligor can properly delegate the performance of his duty to another unless the delegation is contrary to public policy or the terms of his promise." Restatement (Second) of Contracts § 318, *cited by Burnison v. Johnston*, 764 N.W.2d 96, 99 n.5 (2009). Duties are non-delegable if the contract is one for personal services or if the contract requires the "exercise of personal skill or discretion." Restatement (Second) of Contracts § 318 cmt. c. The Restatement gives the following example as a permissible delegation: "A contracts to deliver B coal of specified kind and quality. A delegates the performance of this duty to C, who tenders to B coal of the specified kind and quality. The tender has the effect of a tender by A." Restatement (Second) of Contracts § 318 illustration 2. The delegations in this case are similar to the example in the Restatement. Therefore, the Project Entities are not prohibited from delegating these duties as a matter of public policy. For the Services Agreements and O&M Agreements to constitute impermissible delegations, they must violate the terms of the PPAs.

NPPD alleges that the Project Entities "fail[ed] to fulfill their contractual duties to 'operate and maintain the Plant and Site.' . . . [and] abdicated their responsibilities and turned over the day-to-day operations and management to a third party with whom NPPD has no contractual agreement." Answer and First Am. Countercl., ECF No. 50 at Page ID 745. NPPD argues that the Services Contracts and O&M Contracts violate section 10.2.1 which prohibits the Project Entities from

> assign[ing] this Agreement, or any of [the] rights or obligations under this Agreement (each, a "Transaction") to any Person (the "Transferee"), whether in a single transaction or a series of transactions, unless such Transaction is expressly approved in writing by NPPD . . . and any

14

Transaction in the absence of such required approval shall be void and of no legal effect.

Br. in Supp., ECF No. 69 at Page ID 842.

Under section 4.2, the obligations of the Project Entities are to "construct, solely own, finance, operate and maintain the Plant and Site in a manner which will at all times meet the requirements of [the PPAs]." At no point did the Project Entities delegate the ultimate responsibility for these duties to any third party. If the PPAs were intended to require the Project Entities to "solely" meet each enumerated obligation, such as operation of the Plant and Site, then the term "solely" would have preceded each such verb or headed the list of verbs. It would be absurd to apply the term "solely" to all the Project Entities' obligations, for example the responsibility to finance the construction. The parties agree that the execution of a long-term PPA is needed to obtain financing for a project. Br. in Supp., ECF No. 69 at Page ID 842; Br. in Opp'n, ECF No. 94 at Page ID 2509. Therefore, under the clear terms of the PPAs, the Project Entities did not violate section 10.2.1 or 4.2 by delegating performance of certain duties, because the Project Entities remain ultimately responsible for their obligations.

*B. Threat of Irreparable Harm*

The burden is on the movant to establish the threat of irreparable harm. *Mgmt. Registry, Inc. v. A.W. Cos., Inc.*, 920 F.3d 1181, 1183 (8th Cir. 2019) (citing *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 318 (8th Cir. 2009)). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Grasso Ents., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)).

The Project Entities argue that if NPPD is permitted to terminate the PPAs, they will be irreparably harmed in four ways:

> (1) [T]ermination will result in the Project Entities' default of their credit agreements with lenders, who will possess remedies that could prompt the need for bankruptcy; (2) loss of PPA contract pricing risks financial failure of the Project[ Entities] and loss of each facility as a going concern; (3) NPPD would gain the right to assert eminent domain at post-termination fair market value; and (4) the PPAs specifically contemplate that a dispute over transactions subject to Section 10.3 will result in irreparable harm for which either party would have the right to seek injunctive relief.

Br. in Supp., ECF No. 69 at Page ID 873.

### 1. Default of Credit Agreements

The Project Entities assert that if NPPD terminates the PPAs, this will constitute a breach of the credit agreement between each Project Entity and its lender. The lenders could then accelerate the Project Entities' debt and foreclose security interests in certain assets. The Project Entities assert that this would lead to bankruptcy. In *Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975), the Supreme Court stated "[c]ertainly the [risk of bankruptcy] sufficiently meets the standards for granting interim relief, for otherwise a favorable judgment might well be useless." *Id.* at 932. Because both preliminary and permanent injunctions require the risk of irreparable harm, the risk of bankruptcy is a risk of irreparable harm under *Doran*.

### 2. Financial Failure and Loss of Facilities

The Project Entities argue that termination of the PPAs would effectively "end the value of each Project as a viable going concern." Br. in Supp., ECF No. 69 at Page ID 874. This is because the PPAs are the only revenue generating source for the Project Entities. If they are terminated, the Project Entities will no longer transact ordinary

business.  Decl. in Supp. of Pls.' Mot. for TRO and Prelim. Inj. (First Hickok Decl.), ECF No. 10-1 at Page ID 50–51.

Several courts have held "proof that a going concern will be forced out of business during the pendency of litigation raises a presumption of irreparable harm." *United States v. Any & All Assets of That Certain Bus. Known as Shane Co.*, 816 F. Supp. 389, 400 (M.D.N.C. 1991) (citing *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977); *Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495 (1981)); *see also Arkansas Hospice, Inc. v. Sebelius*, 1. F. Supp. 3d 915, 926 (E.D. Ark. 2014) ("[T]he potential for irreparable harm is present 'when the potential economic loss is so great as to threaten the existence of the moving party's business.' (quoting *Fort Smith Beepers, Inc. v. Mobilefone Serv., Inc.*, 533 F. Supp. 685, 688–89 (W.D. Ark. 1981)); *Paschall v. Kan. City Star Co.*, 441 F. Supp. 349, 358 (W.D. Mo. 1977) ("[T]he loss of business and good will, and the threatened loss of the enterprise itself, constitute irreparable injury to the plaintiff . . . ." (quoting *Carlo C. Geraldi Corp. v. Miller Brewing Co.*, 421 F. Supp. 233, 236 (D.N.J. 1976))).  Therefore, the risk of termination of the Project Entities as going concerns constitutes a risk of irreparable harm.

### C. Balance of Harms

The balance of harms also favors the Project Entities.  For the reasons previously discussed, the Project Entities face several risks of irreparable harm.  NPPD seeks to terminate its agreement with the Project Entities despite no default by the Project Entities.  Because NPPD faces no risk of harm, and the Project Entities face the risk of irreparable harm, this factor favors the Project Entities.

### D. Public Interest

"That the generation of clean, renewable energy is of substantial importance to the public interest is beyond dispute." *Backcountry Against Dumps v. Perry*, No. 3:12-CV-03062-L-JLB, 2017 WL 3712487, at *5 (S.D. Cal. Aug. 29, 2017) (citations omitted). The Nebraska legislature agrees, as it stated, "The Legislature hereby finds and declares that the use of solar energy and wind energy in Nebraska . . . is of such importance to the public health, safety, and welfare that the state should take appropriate action to encourage its use." Neb. Rev. Stat. § 66-901. It is therefore in the public interest to prevent the termination of contracts by which such energy is made.

## II. Conclusion

Because the Project Entities have shown as a matter of law that they did not default on their obligations under the PPAs, and because the balance of the *Dataphase* factors favors issuance of a permanent injunction, NPPD is permanently enjoined from terminating the PPAs in reliance upon its alleged events of default.

Accordingly,

IT IS ORDERED:

1. The Project Entities' Motion for Summary Judgment, ECF No. 68, is granted;
2. NPPD is permanently enjoined from terminating the PPAs in reliance upon the alleged events of default; and
3. A separate judgment will be entered.

Dated this 13th day of April, 2020.

BY THE COURT:

s/Laurie Smith Camp  
Senior United States District Judge